302 Ga. 570
FINAL COPY

S17A0754. BENTON v. THE STATE.

BLACKWELL, Justice.

Matthew Benton was convicted by a Fulton County jury of malice murder and other crimes in connection with the shooting death of Christopher "Black Magic" Ramsay and the wounding of several others.[1] Benton's motion for a new trial was denied, and he appeals. Benton argues, among other things, that the

---

[1] The crimes occurred on or around July 17, 2008. On October 28, 2008, a Fulton County grand jury indicted Benton along with Maurice Badie and Domonique Hodo. Benton was charged with malice murder (Count 1); felony murder predicated on aggravated assault (Count 2); aggravated assault on Ramsay (Count 4); aggravated assault on Quionez Mabry, Demoroe Paggett, Tyrone Freckleton, and Larry Feggins (Counts 5-8); aggravated battery on Larry Feggins (Count 9); and possession of a firearm during the commission of a felony (Count 10). Benton was tried along with Badie from June 14 through June 22, 2010, and a jury returned a guilty verdict on all counts. The trial court sentenced Benton to life imprisonment for malice murder, a twenty-year consecutive term for the aggravated assault of Mabry, two twenty-year concurrent terms for the aggravated assaults of Paggett and Freckleton, a twenty-year concurrent term for the aggravated battery of Feggins, and a five-year consecutive term for the possession of a firearm during the commission of a felony. The aggravated assault on Feggins merged with the aggravated battery on Feggins. The aggravated assault on Ramsay merged into the malice murder, and the felony murder count was vacated by operation of law. See Malcolm v. State, 263 Ga. 369, 373 (5) (434 SE2d 479) (1993). On June 23, 2010, Benton moved for a new trial, and he amended his motion on May 7, 2014. This motion was denied on March 10, 2015, and Benton timely appealed on March 24, 2015. This case was submitted for a decision on the briefs and docketed to the term of this Court beginning in April 2017.

trial court erred when it refused to suppress incriminating statements he made while in police custody. Because we conclude that Benton's custodial statements were obtained in violation of <u>Miranda v. Arizona</u>, 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966), we reverse the judgment of the trial court.

1. Construed most strongly in support of the verdicts, the evidence shows that, on the night of July 17, 2008, while Ramsay and the other victims were drinking, smoking, and socializing outside of an apartment building in the Trafalgar Square Apartments, Benton and his accomplices began shooting at the group, killing Ramsay and wounding four others. Some of the victims returned fire, and the shooting stopped only after law enforcement and emergency response personnel arrived on the scene. Despite the large number of people in the area, investigators had difficulty obtaining statements from eyewitnesses. Eventually, one eyewitness came forward and identified Benton as one of the shooters. The eyewitness had been at Trafalgar Square on the day of the shooting, observed the events leading up to the shooting, and was present throughout the shooting itself.

Around noon on the day of the shooting, the eyewitness saw Benton's younger brother, Drique, riding a four-wheeler. About this time, the eyewitness

overheard a confrontation between Drique and Ramsay concerning the four-wheeler.[2] The eyewitness testified that, following this confrontation, Drique met up with a group of Benton's acquaintances, and they all gathered to talk for around four or five minutes before dispersing. Later that afternoon, the eyewitness saw a group of men approach Ramsay. They confronted Ramsay about drawing a gun on a "young kid" and asked him if he would "try to draw one on a man." The eyewitness also heard other people yelling at Ramsay that at "12:00 . . . we going to see how much of a man . . . are you."

Around 11:45 that same night, the eyewitness heard some rustling noise (like a "stray dog or a stray cat") coming from a cut-through that connected the Trafalgar Square Apartments with a neighboring apartment complex. At midnight, he heard gunfire coming from the same direction as the noise and saw people running and screaming. The eyewitness identified Benton and Maurice Badie as two of the shooters, and he saw Ramsay get shot in the head and other people get struck while they were taking cover and returning fire. Later, the eyewitness identified Benton as one of the shooters from a photographic lineup.

---

[2] The eyewitness mentioned that Ramsay allegedly pointed a gun at Drique during this confrontation, but then the eyewitness testified that he never actually saw Ramsay with a gun.

Benton was arrested on September 9, 2008, and he was interviewed by an officer about Ramsay's murder. During the videotaped interview, Benton denied any involvement in the shooting that killed Ramsay, but he admitted to shooting at Ramsay on two previous occasions. Benton also expressed knowledge about the four-wheeler dispute and about Ramsay pointing a gun at his brother Drique. Benton moved to suppress the statements, and the trial court held a Jackson-Denno[3] hearing on the matter and reviewed a video recording of the interview. The court found that Benton was advised of his Miranda rights,[4] that he understood them and voluntarily waived them, and that, based on the totality of the circumstances, Benton gave his statements freely and voluntarily, without any hope of benefit or fear of injury. Consequently, Benton's entire interview was played for the jury at trial, accompanied by the testimony of the officer who interrogated him.

Benton does not dispute that the evidence was sufficient to sustain his convictions. Nevertheless, as is our customary practice in murder cases, we

---

[3] See Jackson v. Denno, 378 U. S. 368 (84 SCt 1774, 12 LE2d 908) (1964).

[4] See Miranda, 384 U. S. at 479 (III) (an individual who is taken into police custody "must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires").

independently have reviewed the record with an eye toward the legal sufficiency of the evidence. We conclude that the evidence presented at trial was sufficient to authorize a rational trier of fact to find beyond a reasonable doubt that Benton was guilty of malice murder and the other offenses of which he ultimately was convicted. See Jackson v. Virginia, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

2. As his first enumeration of error, Benton argues that his incriminating statements to police should have been suppressed because they were elicited without his full understanding of the Miranda warnings and made under threat of physical violence.[5] "When reviewing a trial court's decision on a motion to suppress evidence of a defendant's custodial statement to investigators, we must accept the factual findings and credibility determinations of the trial court unless clearly erroneous." State v. Smith, 299 Ga. 901, 903 (2) (792 SE2d 677) (2016) (citation and punctuation omitted). But "where controlling facts are not in dispute, such as those facts discernible from a videotape, our review is de novo."

___

[5] See State v. Chulpayev, 296 Ga. 764, 771 (2) (770 SE2d 808) (2015) ("Although [OCGA § 24-8-824] uses the term 'confession,' it has long been the law in this State that the rule as to the admissibility of an incriminatory statement is the same as that applied to a full confession." (citation and punctuation omitted)).

5

Vergara v. State, 283 Ga. 175, 178 (657 SE2d 863) (2008) (citation and punctuation omitted); see also Clay v. State, 290 Ga. 822, 826 (1) (A) n.1 (725 SE2d 260) (2012) ("This Court owes no deference to a trial court's factual findings gleaned from a review of a videotape that are not the subject of testimony requiring the trial court's weighing of credibility or resolving of conflicts in the evidence."). We look to the "totality of the circumstances" to determine whether a defendant has waived his rights under Miranda and whether his incriminating statements to the police were voluntary. Bunnell v. State, 292 Ga. 253, 255 (2) (735 SE2d 281) (2013).

With these standards in mind, we turn to Benton's contention that his statements should have been suppressed because he did not fully understand his Miranda rights. Miranda warnings are intended to preserve a defendant's Fifth Amendment right against self-incrimination and "must be administered to an accused who is in custody and subject to interrogation." State v. Troutman, 300 Ga. 616, 617 (1) (797 SE2d 72) (2017). Only if the defendant knowingly and intelligently waives his rights under Miranda are any of his custodial statements admissible in the prosecution's case-in-chief. Clay, 290 Ga. at 825-826 (1) (A); Phillips v. State, 285 Ga. 213, 215 (2) (675 SE2d 1) (2009) ("A statement

6

obtained in violation of <u>Miranda</u> is inadmissible in the State's case-in-chief, regardless of whether said statement is incriminating, because <u>Miranda</u> covers any response — whether inculpatory or exculpatory — that the prosecution may seek to introduce at trial." (citation and punctuation omitted)).

Looking at the totality of the circumstances in this case, we conclude that Benton did not knowingly and intelligently waive his rights under <u>Miranda</u>, and the trial court erred when it concluded otherwise. The videotape shows that, prior to beginning the interview, the interrogating officer read Benton the <u>Miranda</u> warnings from a card, as follows:

> You have the right to remain silent. Anything you say will be used against you in the court of law. You're entitled to have a lawyer present now or at any time during questioning. If you cannot afford a lawyer, one will be appointed for you without cost, and he may be present at all times during your questioning. You can decide at any time to exercise these rights and not answer any questions or make any statements.

After reading these warnings, the officer asked, "do you understand what I just explained to you?," and Benton nodded. The officer then asked Benton how far he went in school and whether he could read, to which Benton replied that he was "kicked out" of school in ninth grade and that he could read, but "not that much." The officer then asked Benton to explain what the officer just

7

read to him, "so we're on the same page," and Benton responded something like this: "I go to court, and I can't answer no questions or ask no questions."[6] The officer said "no," and then tried to explain the substance of the Miranda warnings to Benton in simpler terms.

Specifically, the officer told Benton, "right now we're here to talk, on why you're here . . . you don't have to talk to me right now, if you don't want to, or you can explain your side of what we're talking about." The officer again repeated that "you don't have to [talk] if you don't want to," and said "it ain't like the TV where I'm slamming you all around and trying to get you to talk . . . nah, it ain't like that . . . or where I hit you with telephone books. . . ." This last comment elicited a smile from Benton. The officer then told Benton that he just wanted to have a conversation "man to man," that he wanted to know the truth about what Benton knew, and that Benton had the option of refusing to talk. The officer concluded, "so you understand what I'm talking about now?," to which Benton responded, "yeah." At this point, the officer proceeded to question Benton about the events surrounding Ramsay's killing.

---

[6] It is difficult to discern from the video the precise words Benton spoke, but it seems clear that he did not initially understand the rights read to him.

The above colloquy shows that Benton did not understand the Miranda warnings as read to him initially. Although Benton at first indicated by nodding that he understood them, when the officer asked him to characterize those warnings, Benton's response was patently inaccurate. Indeed, the interrogating officer testified at trial that "it was obvious [Benton] didn't understand his rights at that time."[7] It was for this reason that the officer attempted to explain the Miranda warnings to Benton in "layman terms" by telling him that he did not have to talk. To be sure, this explanation may have been sufficient to apprise Benton of his right to remain silent. See Duckworth v. Eagan, 492 U. S. 195, 202 (109 SCt 2875, 106 LE2d 166) (1989) ("We have never insisted that Miranda warnings be given in the exact form described in that decision."). But the officer's explanation was nevertheless inadequate because it failed to include three of the four Miranda warnings — that anything Benton said could be used against him in court, that he had a right to an attorney's presence, and that if he could not afford an attorney, one would be appointed to represent him. See

---

[7] "[W]hen a question is raised on appeal about the voluntariness of a statement, the appellate court is not limited to the evidence adduced at a Jackson-Denno hearing, and it instead may look to all the evidence of record in determining the admissibility of a confession." Butler v. State, 292 Ga. 400, 404 (2) n.7 (738 SE2d 74) (2013) (citation and punctuation omitted).

9

Miranda, 384 U. S. at 479 (III); United States v. Street, 472 F3d 1298, 1311 (IV) (B) (11th Cir. 2006) (officer's Miranda warning was defective because it "omitted the advice that anything [defendant] said could be used against him in a court of law and that if he could not afford an attorney one would be appointed for him"). When the officer began to question Benton after explaining his right to remain silent in layman's terms, the officer did not even refer back to his initial reading of the Miranda warnings to make sure Benton understood the other components of the warnings. As the Eleventh Circuit pointed out, an incomplete Miranda warning "is one instance in which halfway is not close enough." Street, 472 F3d at 1311 (IV) (B). See also Delacruz v. Commonwealth, 324 SW3d 418, 420 (Ky. Ct. App. 2010) (holding that officer's explanation of Miranda warnings was "incomplete and insufficient" because the officer "only asked if [defendant] understood that he did not have to answer questions" and "never ascertained that [defendant] understood all of his Miranda rights").

Needless to say, a person must understand his rights in order to knowingly and intelligently waive them. See Berghuis v. Thompkins, 560 U. S. 370, 382-383 (III) (B) (130 SCt 2250, 176 LE2d 1098) (2010) ("[W]aiver must be . . . made with a full awareness of both the nature of the right being abandoned and

10

the consequences of the decision to abandon it." (citations and punctuation omitted)); Clay, 290 Ga. at 825-826 (1) (A) ("It is axiomatic that a rendering of the Miranda warnings must be intelligible before a defendant can knowingly and intelligently waive the rights involved."); State v. Floyd, 306 Ga. App. 402, 405-406 (702 SE2d 467) (2010) (trial court did not err in suppressing statements where evidence showed defendant did not understand his Miranda rights, even though the officer read those rights to defendant and had him sign the Miranda waiver form). Here, the record clearly demonstrates that Benton did not understand the Miranda warnings as initially read to him — the interrogating officer concluded that Benton did not understand, and our review of the recorded interview confirms that conclusion. Because the interrogating officer's subsequent explanation of those warnings was incomplete, we cannot say that Benton knowingly and intelligently waived his rights under Miranda. Accordingly, the trial court erred when it refused to suppress the statements Benton made during the interrogation, and Benton must be granted a new trial.[8]

---

[8] We acknowledge that an error based on a violation of Miranda is not reversible if it was "harmless beyond a reasonable doubt." Spears v. State, 296 Ga. 598, 604 (4) (769 SE2d 337) (2015). But the State does not allege harmless error here. Indeed, the State's evidence against Benton came primarily from one witness — the only one who saw Benton participate in the shooting — and the statements Benton made during the interview provided substantial supporting evidence of guilt. Thus, we cannot say that the Miranda violation was harmless beyond a reasonable doubt.

11

3. Because we reverse the judgment of conviction, we do not address Benton's remaining claims, as those claims are either moot or unlikely to arise again upon retrial. See <u>Willingham v. State</u>, 279 Ga. 886, 889 (3) (622 SE2d 343) (2005).[9]

<u>Judgment reversed. All the Justices concur.</u>

---

[9] Benton's other enumerations of error raise the following issues: (1) whether the trial court erred in excluding Benton's statement to police as a self-serving declaration; (2) whether the prosecutor improperly vouched for the veracity of the State's key witness (the eyewitness) during closing argument; (3) whether the State violated the "ultimate issue rule" when it questioned the interrogating officer about Benton's custodial statements; (4) whether the trial court improperly allowed the eyewitness's statement to detectives to be read to the jury, as that statement, Benton asserts, contained inadmissible hearsay; (5) whether the trial court erred when it ruled that part of the eyewitness's testimony fell within the "res gestae" exception to the hearsay rule (the new Evidence Code, effective January 1, 2013, which would apply in the event of Benton's retrial, does not use the term "res gestae"); and (6) whether this case should be remanded to the trial court for a hearing on Benton's claim of ineffective assistance of counsel.

Decided October 30, 2017 — Reconsideration denied November 14, 2017.

Murder. Fulton Superior Court. Before Judge Baxter.

James K. Luttrell, for appellant.

Paul L. Howard, Jr., District Attorney, Lyndsey H. Rudder, Teri B. Walker, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Mary C. Greaber, Assistant Attorney General, for appellee.