307 Ga. 773
FINAL COPY

S19A1592. WELLS v. THE STATE.

PETERSON, Justice.

Tyrecquiss Wells appeals his convictions for felony murder and other crimes in connection with the shooting death of David Scott.[1] Wells argues that (1) the trial court erred in denying his motion to suppress his custodial statements on the ground that he did not

---

[1] The crimes occurred on September 19, 2013. In February 2015, a Muscogee County grand jury returned a multi-count indictment against Wells and four other co-indictees (Jaylin Dixon, Donald Fair, Christopher Pender, and Christopher Whitaker). Wells was charged with malice murder (Count 1), felony murder predicated on aggravated assault (Count 2), three counts of aggravated assault for assaults on Scott, Eric Morris, and Sergio Mayfield (Counts 3, 5, and 9, respectively), criminal attempt to commit armed robbery of Morris and Scott (Count 4), two counts of possession of a firearm during the commission of a felony (Counts 6 and 10), theft by receiving stolen property (Count 7), armed robbery of Mayfield (Count 8), fleeing or attempting to elude a police officer (Count 15), and two counts of possession of a firearm by a convicted felon (Counts 17 and 18). Following a joint trial with co-defendants Fair, Pender, and Whitaker in March 2016, the jury found Wells not guilty of malice murder but found him guilty on all other charges, except Counts 17 and 18, which had been severed prior to trial and were later nolle prossed. The trial court sentenced Wells to life without the possibility of parole on Count 2, a thirty-year concurrent term on Count 4, twenty-year concurrent terms on Counts 5, 8, and 9, and five-year terms on Counts 6, 7, 10, and 15 to run consecutively to Count 2; the trial court merged Count 3 with Count 2. Through new counsel, Wells filed a motion for new trial on April 21, 2016, which he later amended. On May 8, 2019, the trial court denied Wells's motion for new trial following a hearing. Wells timely appealed, and his case was docketed to this Court's August 2019 term and submitted for a decision on the briefs.

knowingly waive his rights; (2) his confrontation right was violated when the trial court admitted an accomplice's inculpatory statements; and (3) trial counsel was ineffective for failing to file a motion to sever his trial from those of his co-defendants. We affirm because (1) the record shows that Wells knowingly waived his rights when he voluntarily agreed to speak with the police; (2) there was no confrontation violation because the accomplice testified at trial and Wells was able to cross-examine him; and (3) trial counsel's reason for not filing a motion to sever was not objectively unreasonable.

Viewed in the light most favorable to the jury's verdicts, the trial evidence showed the following. On September 19, 2013, Wells, Jaylin Dixon, Christopher Pender, and Christopher Whitaker planned to rob Sergio Mayfield. Whitaker arranged a meeting with Mayfield on the pretense of purchasing some marijuana. Wells drove Dixon and Pender toward Mayfield's residence in a Ford F-150 that Pender had stolen a few days earlier. Dixon was armed with an AR-15 rifle that Wells had provided, while Pender had a .45-caliber

pistol. On the way, the men saw Mayfield driving his vehicle and followed him to his house. Once there, Dixon and Pender quickly exited the truck and approached Mayfield. Dixon pointed his gun at Mayfield's face and demanded that Mayfield "give it up." Mayfield gave Dixon and Pender about $400, but when Mayfield flinched, Dixon and Pender began shooting, hitting Mayfield in the stomach. Mayfield sped off in his vehicle, ended up at a hospital, and survived the shooting.

Dixon and Pender returned to the truck, and Wells drove them to meet up with Whitaker and Donald Fair. Wells proposed that the group rob a gambling house, and the other four agreed. Dixon drove the group in the stolen Ford F-150. Wells had a 9mm pistol with an extended magazine clip, Pender still had the .45-caliber pistol, Fair had the AR-15 that was used to shoot Mayfield, and Whitaker had a Jimenez 9mm pistol. A few blocks from the gambling house, Wells instructed Dixon to block a white Chevy Impala that was occupied by David Scott and Eric Morris. Once the truck stopped, Wells exited the truck, approached the driver's side of the Impala, pointed his

gun at the car, and demanded that Scott and Morris get out. Scott, who was driving the Impala, attempted to flee in reverse, at which point Wells, Pender, Whitaker, and Fair began firing at the vehicle. Scott was struck multiple times and crashed into a tree; he died as a result of a gunshot wound to the head. Wells and the rest of his group fled and later set the stolen truck on fire.

Dixon was later arrested and gave a statement to the police after waiving his rights. Dixon confessed to his role in the two shootings, and helped the police apprehend Wells by calling Wells to ask for a ride. Officers had been at an apartment complex from which Wells's cell phone was pinging, and had received reports that Wells had been driving a grey Chevy sedan. After Dixon made the call, officers followed Wells and attempted to conduct a traffic stop, but Wells fled and led officers on a high-speed chase. Wells abandoned his vehicle and was ultimately apprehended. Police found a bag in the vehicle containing a black ski mask. About the same time, Latisa Murray called to report that the vehicle had been

stolen. Murray said that she lent the car to Wells but he never returned, and that she sometimes let him stay at her apartment.

Officers obtained Murray's consent to search her apartment, and during the search recovered another black ski mask and an empty box of Winchester .223 caliber ammunition that was consistent with the brand and caliber of some of the rounds found at the scene of the Scott shooting. Murray said that these items belonged to Wells. Police also searched Wells's residence and found an AR-15 rifle and several rounds of Blazer 9mm ammunition, which was the brand and caliber of other ammunition recovered from the Scott shooting.

After being advised of his *Miranda*[2] rights and waiving them, Wells told police that he was present for the Mayfield shooting. He claimed that he thought they were there only to buy marijuana, not rob Mayfield. Wells denied participating in or being present for the Scott shooting.

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

1. Although Wells does not challenge the sufficiency of the evidence, it is our customary practice in murder cases to review the record independently to determine whether the evidence was legally sufficient. Having done so, we conclude that the evidence was sufficient to authorize a rational trier of fact to find beyond a reasonable doubt that Wells was guilty of the crimes for which he was convicted. See *Jackson v. Virginia*, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979).

2. Wells argues that the trial court erred by denying his motion to suppress his custodial statements,[3] because he did not understand fully his right to remain silent. Wells's claim has no merit.

To use a defendant's custodial statements in its case-in-chief, the State must show that the defendant was advised of his *Miranda* rights and that he voluntarily, knowingly, and intelligently waived them. See *Benton v. State*, 302 Ga. 570, 573 (2) (807 SE2d 450)

---

[3] The trial court stated at the conclusion of the hearing on Wells's motion that it would enter a ruling the following morning. The record on appeal does not contain any written ruling by the trial court, but Wells's statements were introduced at trial.

(2017); *State v. Clark*, 301 Ga. 7, 10 (2) (799 SE2d 192) (2017). In determining whether a defendant's waiver is voluntary, knowing, and intelligent, a trial court must consider the totality of the circumstances to determine whether the defendant's waiver was free of intimidation and coercion and whether the waiver was "made with a full awareness of both the nature of the right[s] being abandoned and the consequences of the decision to abandon [them]." *Berghuis v. Thompkins*, 560 U.S. 370, 382-383 (130 SCt 2250, 176 LE2d 1098) (2010) (citation and punctuation omitted); see also *Clark*, 301 Ga. at 10-11 (2). We generally review a trial court's factual findings and credibility determinations for clear error, but "where controlling facts are not in dispute, such as those facts discernible from a videotape, our review is de novo." *Benton*, 302 Ga. at 572 (2) (citation and punctuation omitted).

A video recording of the custodial interview was admitted into the record and played at the suppression hearing. The recording shows that Wells was advised of his *Miranda* rights, and Wells stated that he understood his rights and did not have any questions

7

about them. The detective who interviewed Wells said that Wells was coherent during the advisement of rights and appeared to comprehend the advisement, and the recording confirms this testimony. The record shows that Wells marked his initials on the form next to each warning and signed the waiver of rights section on the form, signaling that he reviewed the rights and voluntarily waived them.

Without citing any record evidence, Wells baldly asserts that he did not fully understand his right to remain silent. But the record does not support Wells's claim; instead, the record shows that Wells understood his rights and that he voluntarily, knowingly, and intelligently waived them. His claim fails.

3. Wells next argues that the trial court's admission of inculpatory statements from co-indictee Dixon violated his right of confrontation. His claim fails, because Dixon testified at Wells's trial and Wells was able to cross-examine him. See *Ardis v. State*, 290 Ga. 58, 60-62 (2) (a) (718 SE2d 526) (2011).

4. Wells argues that his trial counsel was ineffective in failing

to file a motion to sever his trial from those of Fair, Pender, and Whitaker, arguing that the number of defendants on trial and the multiple crimes on different dates created so much confusion that there was a high probability that the jury was confused about each defendant's role in the crimes. We disagree.

To establish that trial counsel was constitutionally ineffective, Wells "must show that trial counsel's performance fell below a reasonable standard of conduct and that there existed a reasonable probability that the outcome of the case would have been different had it not been for counsel's deficient performance." *Scott v. State*, 290 Ga. 883, 889 (7) (725 SE2d 305) (2012) (citing *Strickland v. Washington*, 466 U.S. 668 (104 SCt 2052, 80 LE2d 674) (1984)). If an appellant fails to meet his burden in establishing one prong of the *Strickland* test, we need not review the other, as a failure to meet either of the prongs is fatal to an ineffectiveness claim. See *Smith v. State*, 296 Ga. 731, 733 (2) (770 SE2d 610) (2015). In considering an ineffectiveness claim, we review a trial court's factual findings for clear error and its legal conclusions de novo. *Lawrence*

*v. State*, 286 Ga. 533, 534 (2) (690 SE2d 801) (2010).

Whether to seek a severance is a matter of trial strategy, see *Green v. State*, 302 Ga. 816, 819 (2) (b) (809 SE2d 738) (2018), and trial counsel's decision in this respect would constitute deficient performance only if it was so unreasonable that no competent attorney would have made that decision. See *Lupoe v. State*, 300 Ga. 233, 251 (18) (794 SE2d 67) (2016).

At the motion for new trial hearing, trial counsel testified that he did not file a motion to sever because he believed that the evidence against Wells was more substantial than the evidence against his co-defendants, the best trial strategy was to deflect blame on them, and this strategy would work best if the other co-defendants were present. When asked if the jury would be confused by all of the names and places involved in the crimes, trial counsel testified that any confusion might benefit Wells, as the jury might assign fault to the other co-defendants. Trial counsel's failure to file a motion to sever was not objectively unreasonable, and so Wells's ineffectiveness claim fails.

*Judgment affirmed. All the Justices concur.*

DECIDED JANUARY 27, 2020.
Murder. Muscogee Superior Court. Before Judge Rumer.
*Reggie A. Lampkin*, for appellant.
*Julia F. Slater, District Attorney, Benjamin E. Gephardt, Assistant District Attorney; Christopher M. Carr, Attorney General,*

*Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Matthew D. O'Brien, Assistant Attorney General*, for appellee.