310 Ga. 64
FINAL COPY

S20A0726.  AGEE v. THE STATE.

BLACKWELL, Justice.

Linda Agee was tried by a Walton County jury and convicted of murder in connection with the fatal shooting of her husband, Randall Peters. Agee appeals, contending that the trial court erred when it admitted certain hearsay statements of a deceased witness and determined that Agee had forfeited her constitutional right to confront that witness.[1] For the reasons that follow, we reverse.

1. Viewed in the light most favorable to the verdict, the evidence presented at trial shows the following. Agee lived with Peters and their twin daughters in a Walton County neighborhood

---

[1] Peters was killed on March 19, 1992. In April 2014, a Walton County grand jury indicted Agee for murder with malice aforethought and murder in the commission of a felony (aggravated assault). Agee was tried in May and June 2015, and the jury found her guilty on both counts. The trial court sentenced Agee to imprisonment for life for malice murder, and the felony murder count was vacated by operation of law. Agee filed a motion for new trial in June 2015, and she amended the motion in January 2018. After a hearing, the trial court denied Agee's motion for new trial in September 2019. Agee timely appealed, and this case was docketed to the April 2020 term of this Court and orally argued on April 22, 2020.

that was described by a witness as a "very good" and "very safe" area. Peters ran a produce delivery business with the help of Agee. Due to the couple's work hours, their daughters often would spend the night at the home of Peters's parents, Horace and Linda Peters.

Peters and Agee's marriage was troubled. For about three or four years, Agee had been having an affair with Jeff Sargent, who was himself married and had four daughters. Sargent eventually separated from his wife, and their divorce was finalized in the month of Peters's death. Peters knew about Agee's affair with Sargent, which often led to arguments.

On March 19, 1992, around 9:45 p.m., Agee dropped off her daughters at Horace and Linda's house. Less than an hour later, Linda heard the doorbell ring, and when she opened the door, Agee was there, asking them to check on Peters. Agee said that, when she came home to her house, she saw a "tall dark figure go across the hall," heard water running, and heard Peters yell, "It's hot, it's hot." Agee explained that she then got in her car and drove to Horace and Linda's house to seek help.

Upon hearing this, Horace immediately left to go to Agee's house, while Linda called Agee's neighbor and asked him to check on Peters. When the neighbor entered Agee's house, he found Peters lying in the hallway with a "hole in his chest." The police arrived shortly thereafter. An autopsy revealed that Peters died from two gunshot wounds.

An officer who entered the house observed that the den and one of the bedrooms were ransacked, but the other bedrooms were left untouched. The bathtub contained blood spatters and was full of water. A wad of cash lay on the ground in front of the residence. Peters's truck was gone. The police concluded that this was not a burglary because, aside from the truck, nothing of value was taken from the house. Moreover, it was not common for a burglary to occur at that time in the evening, when most people are at home and awake. Peters's truck was found later that night, abandoned on the side of a road, with some personal belongings scattered on the ground beside the vehicle. There were no signs of forced entry into the truck.

The police interviewed Agee at 1:40 a.m. on March 20, several hours after Peters's death, and she gave the following account of the preceding evening. About 7:40 p.m., Agee went with her daughters for softball practice at a nearby ballpark known as Coker Field. After practice, Agee dropped off her daughters at her in-laws' house. When she arrived back home around 10:00 p.m., she realized that she might have left her tennis shoes at the ball field. She saw Peters talking on the phone, so she patted him on the arm and told him that she had to go back to the ball field to get her shoes. Agee then drove to Coker Field and retrieved her tennis shoes from a bleacher in the dugout.

Agee told the police that, when she got home from Coker Field around 10:30 p.m., she heard a dog barking. She opened the door and stepped inside the house, with the tennis shoes in one hand and her pocket book in the other. At that point, she heard Peters say, in a "crying" tone of voice, "It's hot, it's hot." She looked up and saw a dark-colored "jacket standing there in the doorway of that bathroom I guess where [Peters's body] was found, there in the hall . . . . I could

4

just see like the back part of the jacket." She also saw that the back door was wide open. Agee said that she was scared and, not knowing what to do, drove to her in-laws' house to get help. Agee further told the police during that interview that she normally carried a set of keys to Peters's truck but had removed them from her key chain the day before, or several days earlier, because she did not know who was going to drive the truck to pick up produce. She explained that Horace sometimes drove the truck and that he borrowed keys either from Peters or Agee. She also said that Peters left his keys in the truck "99 percent of the time."

Agee's statements to the police were cast in doubt by other evidence. One witness testified that he was a youth minister in March 1992 and was responsible for closing down Coker Field. On March 19, he saw Agee leave practice with her daughters around 9:30 p.m., and he remained on the field until about 10:10 p.m., but he did not see any shoes left behind in the dugout (he had specifically checked that area) and did not see Agee return to the field. Furthermore, Horace testified that he did not have any

conversations with Agee about leaving him the keys to the truck.

The police also interviewed Sargent on the morning after Peters's death. According to one of the interviewing officers, Sargent was "highly agitated" and "very, very nervous" throughout the interview. Among other things, Sargent admitted having an affair with Agee and said that he had called Agee up to three times on the morning of March 19. Sargent further admitted driving by Agee's house around 10:00 p.m. that night to try and see her. Not long afterwards, Sargent said, he met Agee briefly at a day care center known as Susan's Play World. Sargent explained that Agee drove up behind him and blinked her lights, and they stopped at the day care center and had a brief conversation.[2] The interviewing officers indicated to Sargent that they did not believe he was being entirely truthful. Toward the end of the interview, Sargent repeatedly told

---

[2] The interviewing officer gave two versions of what Sargent and Agee discussed at Susan's Play World. The officer first testified that, according to Sargent, Agee said "something to the effect that she had been to the house and something was wrong with [Peters] and she was going to get help." But the officer also testified that Sargent told them the conversation was about "asking [Peters] for a divorce and not wanting to work on the truck anymore."

the officers that, if he told them the truth, "he'd get life or the electric chair."

The police interviewed Agee for a second time, and she admitted that, while on her way to her in-laws to seek help, she stopped briefly at Susan's Play World to talk to Sargent. Agee did not say what they discussed. Susan's Play World was less than a quarter mile from the Monroe Police Department.

A deputy testified that he transported Sargent to the Georgia Bureau of Investigation crime lab in Atlanta to take a polygraph test. Once they got there, however, Sargent's attorney contacted the deputy and said that he advised Sargent not to take the polygraph test. On the way back to Walton County, Sargent asked the deputy to turn around and go back to the crime lab so he could take the polygraph test and prove that he was not at the scene of the crime. Sargent again said that he was scared of getting "life or the death penalty."

One of Sargent's daughters testified that, when she learned that her father was a suspect in Peters's murder, she repeatedly

7

asked him about it, and he gave three different answers. Once, Sargent told her that, if he told the truth or said something, he was "going to go to jail." Another time, Sargent "just put his hand up" to indicate he did not want her asking questions, and yet another time, he said, "I got a Domino's [Pizza] receipt, I can tell you I wasn't there."

Other evidence concerned Agee's conduct in the days surrounding Peters's death. Most notably, about a week before Peters was killed, Agee told her sister that she might not be able to go on a trip to North Carolina that was planned for the weekend of March 21-22 (to visit Agee's brother). Agee explained to her sister that Peters might not let her go — even though the sister had confirmed with Peters that Agee could go — and Agee also said that she was "just tired of all this s**t." After Peters was killed, according to several witnesses, Agee had an unusually calm demeanor, and one witness testified that Agee's grief at Peters's funeral appeared faked. Agee filed a claim on Peters's life insurance policy only a week after his death. She ultimately collected over $100,000 in life

insurance proceeds and inherited some other valuable assets. Furthermore, when Horace learned that Agee was a suspect, he asked her: "[Peters] didn't have to be murdered. Why didn't you get a divorce?" Agee replied, "I asked him for one and he wouldn't give me one."

In addition, the State presented the testimony of Alan Cook, who had served as the district attorney for Walton County. Cook testified that, about a year after Peters was killed, the investigation into his killing had stalled. To jump-start the investigation, Cook's office petitioned the superior court to grant use and derivative-use immunity to Sargent so that he could be compelled to testify before the grand jury without regard to his constitutional privilege against self-incrimination. The day before the immunity hearing, however, Sargent and Agee were married. As a result, when Sargent received immunity and was subpoenaed to testify before the grand jury, he moved to quash the subpoena on the ground of marital privilege, claiming that he could not be compelled to testify against his

spouse.[3] After a hearing, the superior court granted the motion to quash, finding that the marital privilege applied, and the superior court's decision was affirmed by the Court of Appeals.[4] Given Sargent's invocation of the marital privilege, Cook testified, the prosecution was "at a dead end."

Trial evidence further showed that Sargent was still married to Agee on October 12, 2006, when he died as a result of a brain aneurysm. In 2010, the Walton County Sheriff's office retained a retired federal agent to investigate Peters's death. After a 22-month investigation, the retired agent recommended that Agee be prosecuted.

Agee does not dispute that the trial evidence, as summarized above, is sufficient to sustain her conviction. But consistent with our

---

[3] At that time, the marital privilege statute provided, in part: "Husband and wife shall be competent but shall not be compellable to give evidence in any criminal proceeding for or against each other." See former OCGA § 24-9-23 (a). The current version of the statute, OCGA § 24-5-503, retains this language.

[4] See State v. Peters, 213 Ga. App. 352 (444 SE2d 609) (1994).

10

usual practice in murder cases, we independently have reviewed the record to assess the legal sufficiency of the evidence.[5] We conclude that the evidence presented at trial, when viewed in the light most favorable to the verdict, was sufficient to authorize a rational trier of fact to find beyond a reasonable doubt that Agee was guilty of murder with malice aforethought. See Jackson v. Virginia, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).[6]

2. Agee's sole claim on appeal is that the trial court erred when it ruled that Sargent's statements to law enforcement were admissible. She argues that those statements were "testimonial," and because she did not have a prior opportunity to cross-examine

---

[5] We remind litigants that, beginning with cases docketed to the term of this Court that begins in December 2020, we will end our practice of considering sufficiency sua sponte in non-death penalty cases. See Davenport v. State, 309 Ga. 385, 399 (4) (b) (846 SE2d 83) (2020). This Court began assigning cases to the December term on August 3, 2020.

[6] We note that, when we review the sufficiency of the evidence, "we consider all of the evidence admitted by the trial court, regardless of whether that evidence was admitted erroneously." Dublin v. State, 302 Ga. 60, 67-68 (5) (805 SE2d 27) (2017) (citation and punctuation omitted). Our holding that the evidence was sufficient to sustain Agee's conviction takes into account Sargent's statements to the police, which were admitted erroneously, as discussed below. We express no opinion as to whether the evidence would have been constitutionally sufficient absent those statements.

11

Sargent, the admission of those statements violated the Confrontation Clause of the Sixth Amendment. See Varner v. State, 306 Ga. 726, 730 (2) (b) (i) (832 SE2d 792) (2019) ("A Confrontation Clause violation occurs when an out-of-court statement admitted into evidence is 'testimonial' in nature and the declarant is unavailable at trial and was not previously subject to cross-examination." (citing Crawford v. Washington, 541 U. S. 36 (124 SCt 1354, 158 LE2d 177) (2004)). See also Johnson v. State, 289 Ga. 22, 26 (4) (709 SE2d 217) (2011) ("The Confrontation Clause generally prohibits the admission of an out-of-court testimonial statement made by a declarant who is not available for cross-examination by the accused.").

When the trial court admitted Sargent's statements into evidence, it acknowledged Agee's constitutional right to confrontation, but it ruled that she had forfeited that right through wrongdoing. The trial court elaborated on this ruling in its order denying Agee's motion for a new trial. The court explained that, although "it would seem pretty clear" that the Confrontation Clause

12

"would categorically prohibit the introduction of Sargent's pre-trial statements," these statements nevertheless were admissible because Agee herself procured Sargent's unavailability. Specifically, the court found, Agee exercised control over Sargent and married him for the purpose of using the marital privilege to prevent him from testifying against her. Agee's marriage, the court said, was "a sham designed to procure the unavailability of a key witness."

To begin, the State does not dispute that Sargent's statements to law enforcement — including statements that he was afraid of receiving life imprisonment or the death penalty if he told the truth — are presumptively inadmissible under the Confrontation Clause. Those statements were "testimonial," and Agee did not have an opportunity to cross-examine Sargent about the statements. See Varner, 306 Ga. at 730 (2) (b) (i); Jenkins v. State, 278 Ga. 598, 605 (2) (604 SE2d 789) (2004) ("[A] statement is testimonial if it is made with the involvement of government officers in the production of testimonial evidence, which includes police interrogations." (Citation and punctuation omitted)). The only exception to the

Confrontation Clause that arguably applies in this case is forfeiture by wrongdoing. See <u>Davis v. Washington</u>, 547 U. S. 813, 833 (IV) (126 SCt 2266, 165 LE2d 224) (2006) ("[O]ne who obtains the absence of a witness by wrongdoing forfeits the constitutional right to confrontation."). See also <u>Crawford</u>, 541 U. S. at 62 (V) (A) ("[T]he rule of forfeiture by wrongdoing (which we accept) extinguishes confrontation claims on essentially equitable grounds . . . .").[7] We have said that, to establish forfeiture by wrongdoing, the State must show "(1) that the defendant engaged or acquiesced in wrongdoing, (2) that the wrongdoing was intended to procure the declarant's unavailability, and (3) that the wrongdoing *did procure the unavailability*." <u>Hendrix v. State</u>, 303 Ga. 525, 528 (2) (813 SE2d 339) (2018) (citation and punctuation omitted; emphasis supplied).

In determining that Agee forfeited her confrontation rights, the

---

[7] Wrongful procurement of a witness's absence is also an exception to the general prohibition on hearsay under the rules of evidence. See OCGA § 24-8-804 (b) (5) ("The following shall not be excluded by the hearsay rule if the declarant is unavailable as a witness: . . . A statement offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness.").

14

trial court focused on its finding that Agee married Sargent ostensibly to prevent him from testifying against her through the use of marital privilege. This finding is not dispositive, however, and we need not decide whether Agee's marriage to Sargent indeed qualifies as "wrongdoing" sufficient to forfeit her confrontation rights. That is because the State has failed to show the third prerequisite of forfeiture by wrongdoing — that Agee's conduct actually procured Sargent's unavailability at trial. See Hendrix, 303 Ga. at 528 (2). Undisputed evidence shows that Sargent died from a natural cause — a brain aneurysm — years before Agee was even indicted. Thus, it was Sargent's natural death, not any conduct by Agee, that caused him to be unavailable to testify and be subjected to cross-examination at her trial. Whether Sargent would have remained married to Agee but for his death and whether he would have again asserted his marital privilege if she had been indicted and brought to trial in his lifetime are matters of pure speculation. Forfeiture by wrongdoing means that a defendant cannot be heard to object to out-of-court declarations offered against her on the

ground that she had no opportunity to confront and cross-examine the declarant when the reason she could not confront and cross-examine the declarant is her own wrongdoing designed to procure the declarant's absence. See Giles v. California, 554 U. S. 353, 366 (II) (C) (128 SCt 2678, 171 LE2d 488) (2008); Davis, 547 U. S. at 833 (IV). Because there is no causal connection between Agee's alleged wrongdoing and Sargent's unavailability at trial, the forfeiture-by-wrongdoing exception does not apply.[8] See Greene v. State, 303 Ga. 184, 186 (2) (811 SE2d 333) (2018) (under the forfeiture-by-wrongdoing exception, a trial court may admit statements "against the party *who caused the victim's absence*" (emphasis supplied)); United States v. McLeod, 53 F3d 322, 325 (11th Cir. 1995) ("A

---

[8] Although Agee's conduct may have caused Sargent to be unavailable to testify before a grand jury in 1993, she had no right to confront and cross-examine Sargent in a grand jury proceeding, and there was nothing to forfeit with respect to that proceeding. See Anderson v. State, 258 Ga. 70, 73 (11) (365 SE2d 421) (1988); In re Hall County Grand Jury Proceedings, 175 Ga. App. 349, 351 (3) (333 SE2d 389) (1985) ("An individual has no constitutional right to appear before the grand jury to present evidence and to cross-examine witnesses." (Citation and punctuation omitted.)). Compare United States v. Ponzo, 853 F3d 558, 578-579 (VII) (1st Cir. 2017) (forfeiture by wrongdoing applied where defendant's wrongful conduct prevented him from confronting witness at a prior trial).

16

defendant who *causes a witness to be unavailable for trial* forfeits his right to confrontation." (Emphasis supplied)). Compare <u>Hendrix</u>, 303 Ga. at 529 (2) (forfeiture-by-wrongdoing applied where the defendant's "wrongdoing *did actually cause* [the witness's] unavailability" (emphasis supplied)). Accordingly, the trial court erred when it ruled that Sargent's statements to law enforcement were admissible.

An error of "constitutional magnitude," such as the one in this case, will not warrant a reversal "if the State can prove beyond a reasonable doubt that the error did not contribute to the verdict." <u>McCord v. State</u>, 305 Ga. 318, 321 (2) (a) (825 SE2d 122) (2019) (citation and punctuation omitted). In this case, however, the State does not even argue that the admission of Sargent's statements was harmless, and such an argument would have no merit. Sargent's statements — especially statements that he would receive life imprisonment or the death penalty if he told the truth — were highly incriminating. They were essentially an implicit admission of guilt, providing the most direct evidence that Sargent was involved in

17

Peters's murder. These statements also cast a large shadow of suspicion over Agee, given her close association with Sargent at the time of the killing and their eventual marriage. Indeed, in its closing argument, the prosecution heavily emphasized Sargent's statements about his receiving life in prison or the death penalty if he told police what he knew about the murder.

At the same time, the other evidence against Agee was entirely circumstantial and not particularly strong. No evidence definitively identified Agee or anyone else as the shooter. While a reasonable juror might conclude that certain statements and conduct of Agee suggested that she was somehow involved in Peters's murder, the nature and extent of her involvement are far from clear. Thus, it cannot be said beyond a reasonable doubt that the admission of Sargent's statements did not contribute to the verdict. See Benton v. State, 302 Ga. 570, 575 (2) n.8 (807 SE2d 450) (2017). For the foregoing reasons, we reverse the trial court's denial of Agee's motion for a new trial.

Judgment reversed. All the Justices concur.

18

Decided October 5, 2020.

Murder. Walton Superior Court. Before Judge Johnson.

*Bruce S. Harvey*, for appellant.

*Layla H. Zon, District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Meghan H. Hill, Assistant Attorney General*, for appellee.