312 Ga. 243
FINAL COPY

S21A0780.  ELLIS v. THE STATE.

ELLINGTON, Justice.

A Walker County jury found Robert William Ellis guilty of malice murder and other offenses in connection with the shooting death of Jeremy Little.[1] Ellis contends the trial court erred by

---

[1] The shooting occurred on March 8, 2017. A Walker County grand jury indicted Ellis on October 3, 2017, for malice murder, felony murder, two counts of aggravated assault (as to Little and Julie Woody), first degree criminal damage to property, possession of a firearm during the commission of a felony, two counts of criminal trespass, and possession of a firearm by a convicted felon. Ellis's trial commenced on June 4, 2018. The jury found him guilty on all counts except the aggravated assault of Woody. Instead, the jury found Ellis guilty of the lesser offense of pointing a gun at Woody. The trial court sentenced Ellis to life in prison without parole for malice murder. The court imposed concurrent 12-month sentences for pointing a gun at another and both counts of criminal trespass. The court also imposed the following sentences to run consecutive to the murder sentence: criminal damage to property (ten years), possession of a firearm during the commission of a felony (five years), and possession of a firearm by a convicted felon (five years). The court purportedly merged the remaining convictions, though the felony murder count was actually vacated by operation of law. See *Hulett v. State*, 296 Ga. 49, 53 (2) (766 SE2d 1) (2014). Ellis filed a motion for new trial on June 21, 2018, which he subsequently amended. Following a hearing held on July 19, 2019, the trial court denied Ellis's motion for a new trial. Ellis filed a notice of appeal on August 12, 2019, and this case was docketed to the April 2021 term and submitted for a decision on the briefs.

admitting into evidence his custodial statement, arguing that his statement was made while he was too intoxicated to waive his *Miranda*[2] rights. Ellis also contends that his trial counsel was ineffective because she did not object when a State's witness testified about what a surveillance video allegedly showed, which Ellis argues invaded the province of the jury. For the following reasons, we discern no error and affirm the judgment of conviction.

The evidence presented at trial showed that, on March 8, 2017, Ellis shot and killed Little after Little had allegedly damaged Ellis's 1966 Mustang. The shooting was captured on home surveillance video. Ellis did not deny shooting Little; rather, his defense at trial was that he struck Little with a gun when Little lunged at him with a knife, and that the gun went off accidentally, resulting in Little's death. The shooting was preceded by a series of events that angered both Ellis and Little.

Amanda Jenkins testified that, on the afternoon before the shooting, she encountered Ellis sitting in his white pickup truck

---

[2] *Miranda v. Arizona*, 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

near the home of a mutual friend. Jenkins asked Ellis to give her a ride to her father's home, and he agreed. During the drive, Ellis showed Jenkins two different guns, and he complained that his drugs were missing and that whoever took them "was going to lose their life." Ellis briefly stopped at a store to let Jenkins buy some cigarettes. While in the store, Jenkins saw her friend, Julie Woody, who was engaged to Little. When Ellis repeatedly called Jenkins on her cell phone, Jenkins left the store. When Woody finished shopping and walked out to the parking lot, she saw Jenkins sitting in the passenger seat of a white truck. When Woody walked toward the truck, Ellis, who was bent over outside of the truck, turned around abruptly and pointed a large handgun at her. Ellis told Woody not to walk up on him like that.

Afraid, Woody asked Jenkins if she would ride home with her in her truck, and Jenkins agreed. When the women arrived at Woody's home, Little was there. Jenkins told Little that Ellis had pointed a gun at Woody. Upon hearing Jenkins's account of what had happened, Little got very upset and angry. He told Woody not

to call the police, that he would "handle it." Little gave Jenkins a ride home at about 6:40 p.m.

Around 7:30 p.m., Ellis called the police to report that someone had damaged his 1966 Ford Mustang. That evening, Ellis posted a status on Facebook that read, "Jeremy Little[,] I want you to know that [damaging my] '66 Mustang's windshield and cutting all four tires and running away was your biggest mistake in your life. I'm coming." Then, in the comments section of the post, Ellis wrote that he was "pissed" and that Little was "stupid."

Woody's landlord, who lived next door to Woody, had surveillance cameras set up that pointed toward the front and back doors of Woody's home. At 7:54 a.m. on March 8, the surveillance system recorded Ellis parking his white truck in front of Woody's home. The video showed Ellis get out of his truck, repeatedly swing something at Little's truck, throw something through the back window of the house, fire a gun into the back door, and then leave. Woody woke when she heard gunshots and loud noises that sounded as if the "house was falling in." Woody testified that, while she ran

4

to check on her mother and brother, who slept in the front rooms of the house, Little ran outside. When he came back inside, he was angry, cursing, and saying that Ellis had just shot up the house and his truck.

After the morning's events, Ellis posted on Facebook: "Hey [Little,] who must've been the stupidest fool ever lived knowing police [and] road blocks ain't going stop me[.] . . . [C]ome back here you fool so I can have life instead of death by injection knowing you ain't going to be [there] to see it." He also wrote that he was "going to give [the emergency] room its next patient."

At 1:16 p.m., while Woody and Little were resting in bed, Ellis returned to Woody's home. He was armed with a handgun that he had purchased that morning. Woody noticed someone walk by outside her bedroom window, and Little went outside through the back door to investigate. The surveillance video showed Little emerging from his back door. Little stood motionless as Ellis approached him and struck him in the head with a handgun and shot him in the face. Woody testified that, as she rose to follow Little

5

outside, she heard a gunshot. Woody ran to the back door, where she found Little lying on the ground with a gunshot wound to his jaw. Ellis stood nearby with a gun in his hand. Ellis told Woody that he did not want to kill Little, then fled. Woody saw Little's pocketknife lying open on his abdomen. She handed the knife to her mother, who had also come outside, and then Woody held Little until the paramedics arrived. Little died as a result of the gunshot wound.

An officer with the Rossville Police Department responded to Woody's house. When he arrived, he found Woody, who was distraught, just outside the back door, holding Little. The officer secured the house for a detective, who arrived shortly thereafter. The detective observed that Woody's house and Little's truck had been damaged. Woody told the detective that Ellis shot Little. While the detective investigated the crime scene, the officer went to Ellis's house, but Ellis was not there. The officer observed that Ellis's Mustang, which had been loaded onto a wrecker, had a broken windshield and flat tires. After the officer photographed the Mustang, he drove to a nearby mobile home park, where Ellis had

6

been seen, and arrested him.

After Ellis was arrested, the police took him to the Rossville Police Department, where he was read his *Miranda* rights and interviewed. The lead detective and an agent with the Georgia Bureau of Investigation ("GBI") conducted the interview. During the video-recorded interview, Ellis admitted that he had purchased a handgun that morning, and that he intended to carry that handgun when he confronted Little for damaging his Mustang. He also admitted that he had damaged Little's truck with a baseball bat, damaged the windows of Woody's home, and kicked the back door. Ellis said that he encountered Little outside Woody's home, and that Little swung a knife at him. Ellis said he reacted by hitting Little in the head with the gun, which he said accidentally discharged.

A GBI crime scene investigator testified that he processed the scene of the shooting. He recovered three spent .45-caliber shell casings from the front of the house, and two from the back. He saw a footprint on Woody's back door and noted that the door appeared to have cracked from a forceful kick. He also saw a small circular

defect below the knob on the door that appeared to be a bullet hole. The investigator found a bullet behind the door. He also noted extensive damage to Little's truck, and he found a baseball bat in the truck's bed.

Ellis's .45-caliber Hi-Point pistol was seized from his impounded truck and submitted to the GBI for ballistics testing, along with the shell casings recovered from the scene of the shooting. A GBI firearms examiner determined that the five shell casings collected from the scene were fired from Ellis's pistol. The firearms examiner testified that the pistol had four separate safety mechanisms. His forensic tests revealed that the pistol would not fire without pressure being applied to the trigger, and that the pistol and its safety mechanisms were functioning properly.

On March 9, the day after the shooting, a detention deputy with the Walker County Sheriff's Office walked by Ellis's cell. The deputy testified that Ellis told him that he "didn't have a choice, he had to kill" Little because Little had a knife.

A GBI medical examiner testified that Little had multiple

8

injuries to his head. He had a laceration and patterned abrasions on his forehead that the examiner opined would have required "pretty significant force to split the skin like that and leave those marginal abrasions like a pattern." Little also had a gunshot wound to his cheek with gunpowder residue and stippling around it, indicating that the weapon had been fired "within a few inches" of Little's face.

1. Ellis contends that, because he was under the influence of drugs when the detective explained his *Miranda* rights at the beginning of his custodial interview, his purported waiver of those rights was not voluntary. Therefore, he argues, the trial court erred by admitting the video-recording of the interview and the detective's testimony concerning statements Ellis made during the interview.[3] As explained below, this claim of error is without merit.

"To use a defendant's custodial statements in its case-in-chief, the State must show that the defendant was advised of his *Miranda*

---

[3] Ellis does not challenge the admission of his statement on the ground that it was involuntary under the constitutional due process standard, and so we do not address that issue. See *Dozier v. State*, 306 Ga. 29, 36 (4) (c) (829 SE2d 131) (2019).

rights and that he voluntarily, knowingly, and intelligently waived them." (Citation and punctuation omitted.) *Hinkson v. State*, 310 Ga. 388, 400 (5) (b) (850 SE2d 41) (2020). A trial court, in assessing whether a defendant's waiver of *Miranda* rights is voluntary, knowing, and intelligent, "must consider the totality of the circumstances to determine whether the defendant's waiver was free of intimidation and coercion and whether the waiver was made with a full awareness of both the nature of the rights being abandoned and the consequences of the decision to abandon them." (Citation and punctuation omitted.) *Wells v. State*, 307 Ga. 773, 776 (2) (838 SE2d 242) (2020). An appellate court generally reviews a trial court's factual findings and determinations of credibility for clear error; however, "where controlling facts are not in dispute, such as those facts discernible from a videotape, our review is de novo." (Citation and punctuation omitted.) Id. Additionally,

> the intoxication of the accused does not automatically invalidate his or her waiver of *Miranda* rights. Intoxication, standing alone, does not render a statement inadmissible. If the evidence is sufficient to establish that the defendant's statement was the product of rational

10

intellect and free will, it may be admitted even if the defendant was intoxicated when he made the statement.

(Citations and punctuation omitted.) *Rowland v. State*, 306 Ga. 59, 64 (2) (829 SE2d 81) (2019).

Before trial, the trial court held a *Jackson-Denno*[4] hearing. The lead detective testified during the hearing, and the State provided the court with a transcript of the detective's custodial interview with Ellis. The detective testified that he advised Ellis of his *Miranda* rights prior to interviewing him, and the video-recording of the interview shows the detective reading those rights to Ellis from a pre-printed form. The detective asked Ellis several times whether he understood the rights that he was waiving, and Ellis nodded and answered "yeah." The detective also asked Ellis if he had any questions, and Ellis answered "no." Ellis said that he wanted to explain what happened. He initialed each of the individual rights on the form read to him, and he signed it at the bottom, indicating that he understood the rights he was waiving. The detective asked Ellis

---

[4] *Jackson v. Denno*, 378 U. S. 368 (84 SCt 1774, 12 LE2d 908) (1964).

if he was using any drugs, and Ellis responded that he had "smoked a little pot and hit a bowl of meth" about an hour before his arrest. Ellis admitted that he smoked meth daily and used marijuana frequently.

The video-recording of the interview shows that Ellis was able to walk, stand, sit, speak, and answer questions without any apparent problem. He did not appear to be under the influence to the extent that he could not comprehend his rights or understand the consequences of their waiver. The detective testified that, based on his experience dealing with people who are under the influence of drugs, he was not concerned that Ellis's drug use had impaired his decision to freely and voluntarily give a statement. During the interview, the detective sat just a few feet from Ellis and was able to observe him closely. Although Ellis was upset, agitated, and displayed a few indicia of intoxication (like dilated pupils), the detective said that he and Ellis were able to communicate with each other without any problem. The detective testified that Ellis gave answers that were coherent and responsive to his questions, and

12

nothing on the video-recording contradicts the detective's testimony. During the hour-long interview, Ellis recounted his side of the story. He told the detective that he retaliated against Little for damaging his car, that he bought a pistol that morning because he was afraid of what Little and unnamed others might do to him, and that he believed he was protecting himself from people who might "burn his house down." The detective testified that many of the details of Ellis's account were consistent with what his investigation had so far revealed. When the detective pressed Ellis on whether he had planned to shoot Little, Ellis became upset, stopped the interview, and demanded a lawyer. Ellis accused the detective of trying to make him angry so that he would say something incriminating. Ellis stood, faced the wall, and put his hands behind his back, inviting the detective to handcuff him. The detective ended the interview.

Although the evidence supports that Ellis was impaired to some degree, "the [detective's] testimony and the recorded interview indicate that . . . [Ellis's] mind was nevertheless clear enough to make a knowing and voluntary waiver of his rights and to speak to

the [detective] without an attorney." *Rowland*, 306 Ga. at 64 (2).

Under these circumstances, the trial court's decision to admit Ellis's

custodial statements was not clearly erroneous. See id.

2. Ellis also contends that his trial counsel was ineffective for

failing to object when the detective testified about what the

surveillance video allegedly showed, which Ellis argues invaded the

province of the jury. Specifically, Ellis contends that his trial counsel

should have objected when the detective narrated the surveillance

video, identifying Ellis and giving a "play-by-play" of what the video

purportedly showed Ellis and Little doing. As explained below, this

claim of error is without merit.

To succeed on this claim, Ellis must demonstrate both that his

trial counsel performed in a constitutionally deficient manner and

that, absent counsel's deficient performance, a reasonable

probability exists that the outcome at trial would have been

different. See *Strickland v. Washington*, 466 U. S. 668, 687-695 (III)

(104 SCt 2052, 80 LE2d 674) (1984). If he fails to satisfy either part

of this test, we need not consider the other. See *Richards v. State*,

14

306 Ga. 779, 781 (2) (833 SE2d 96) (2019). To prove deficient performance, Ellis must show that trial counsel performed "in an objectively unreasonable way, considering all of the circumstances and in light of prevailing professional norms." (Citation and punctuation omitted.) *Reyes v. State*, 309 Ga. 660, 669 (3) (847 SE2d 194) (2020). "A strong presumption exists that counsel's conduct falls within the broad range of professional conduct." (Citation and punctuation omitted.) Id. "Thus, deficiency cannot be demonstrated by merely arguing that there is another, or even a better, way for counsel to have performed." *Davis v. State*, 306 Ga. 140, 144 (3) (829 SE2d 321) (2019). Further, "[t]rial tactics and strategy . . . are almost never adequate grounds for finding trial counsel ineffective unless they are so patently unreasonable that no competent attorney would have chosen them." (Citation and punctuation omitted.) *McNair v. State*, 296 Ga. 181, 184 (2) (b) (766 SE2d 45) (2014). For example, it may be "a sound defense strategy to minimize objections in an effort to show the jury that the defense had nothing to hide." *Hartsfield v. State*, 294 Ga. 883, 889 (3) (b) (757 SE2d 90) (2014).

During the hearing on Ellis's motion for new trial, his trial counsel testified that, given the overwhelming evidence against Ellis, including the video and eyewitness testimony as well as Ellis's own admissions, her theory of defense was that Ellis did not intend to shoot Little. She hoped to secure a conviction for involuntary manslaughter based on Ellis's contention that the gun discharged when he struck Little with it during their confrontation.[5] Counsel believed she had a strong chance of successfully attacking the intent element of malice murder by focusing on that portion of the surveillance video where Ellis appeared surprised when his gun went off as well as those portions of his custodial statement where he said that he did not plan to shoot Little; rather, he only wanted to "smack" him with the gun "to scare him."

Counsel also testified that she chose not to object to the detective's narration of the video because it did not hurt the defense theory and because it was largely consistent with Ellis's account of

---

[5] Defense counsel requested, and the trial court gave, jury instructions on involuntary manslaughter and battery. Counsel did not ask for, and the court did not give, a jury instruction on self-defense.

events. Counsel believed that the video showed not only Ellis's surprise, but also his immediate remorse and fear. Counsel believed that any attempt to limit the detective's testimony might make the jury think the defense was hiding something. It would also prevent her from eliciting during cross-examination similar narration from the detective that favored Ellis. The trial transcript shows that counsel indeed went through the surveillance video with the detective on cross-examination, highlighting those moments where Little is holding a knife and, given the quality of the recording, it is impossible to see Little's facial expression, which Ellis had described during his custodial interview as menacing. Counsel also asked the detective leading questions that served to narrate the video, such as: "And what we could see there Mr. Ellis doing was grabbing his head in astonishment about what happened, right?"

In ruling on Ellis's ineffective assistance of counsel claim, the trial court found that identification was not a disputed issue in the case. The court also concluded that counsel was not ineffective, and that it was a reasonable strategy for trial counsel not to object to the

detective's narration under the circumstances. We discern no error in the court's ruling, and, based on the foregoing, the record shows that trial counsel's decision not to object to the detective's narration of the surveillance video was a matter of reasonable trial strategy. See *Starks v. State*, 283 Ga. 164, 167-168 (6) (b) (656 SE2d 518) (2008). Because Ellis cannot show that his trial counsel acted deficiently, his claim of ineffective assistance of counsel fails. See *Wright v. State*, 291 Ga. 869, 870 (2) (734 SE2d 876) (2012).

*Judgment affirmed. All the Justices concur, except Colvin, J., not participating.*

Decided August 10, 2021.

Murder. Walker Superior Court. Before Judge House.

*Jerry W. Chappell II*, for appellant.

*Christopher A. Arnt, District Attorney, Lynsay P. Chapman, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Ashleigh D. Headrick, Assistant Attorney General*, for appellee.