314 Ga. 617
FINAL COPY

S22A0632.  DOWNER v. THE STATE.

McMillian, Justice.

Following a bench trial in 2016, William Douglas Downer was found guilty of felony murder, armed robbery, and other crimes in connection with the death of Michael Larry Hill.[1] On appeal, Downer

---

[1] The crimes occurred on or about August 30, 2012. In October 2012, a Habersham County grand jury indicted Downer and Albert Buford Brown for malice murder (Count 1), felony murder predicated on burglary (Count 2), armed robbery (Count 3), burglary (Count 4), and aggravated assault (Count 5). In August 2013, the trial court granted Downer's motion to sever his trial from that of Brown. In January 2014, Brown pleaded guilty to murder and first degree burglary and agreed to testify for the State in exchange for a reduced sentence of life imprisonment with the possibility of parole. In March 2015, Downer agreed to a bench trial in consideration for the State's withdrawal of its notice of intent to seek the death penalty. At a bench trial held from January 11 to 15, 2016, Downer was acquitted of malice murder but found guilty of the remaining counts. The trial court sentenced Downer to serve life in prison for felony murder (Count 2) and 20 years in prison for armed robbery (Count 3), to run consecutively; the remaining counts were merged for sentencing purposes. Downer timely filed a motion for new trial, which he amended through new counsel on September 5, 2019, and February 18, 2021. Following a hearing, the trial court denied the motion for new trial on May 12, 2021. Downer timely appealed, but on September 23, 2021, this Court granted Downer's motion to remand the case to the trial court to complete the record. On November 18, 2021, the trial court entered an order to incorporate the missing portions of the record. The case was then docketed to the term of this Court beginning in April 2022, and oral argument was heard on May 18, 2022.

asserts that (1) the evidence was insufficient to sustain his convictions; (2) his custodial statements should have been suppressed; (3) the trial court erred in admitting hearsay statements through two witnesses; (4) the State withheld exculpatory evidence; and (5) the trial court erred in denying his post-trial motion for DNA testing. For the reasons that follow, we affirm.

Viewed in the light most favorable to the verdict, the evidence presented at trial showed that for several months in 2012, Downer lived in a camper on Albert Buford Brown's property in Habersham County, where Brown lived with his girlfriend, Joyce Higgins, and her adult son, Jamie Higgins. As part of his plea deal, Brown testified extensively about his and Downer's roles in the crimes. Brown explained that he occasionally saw Hill, who lived across the street from Brown's parents, when he would visit his parents' home, also in Habersham County. A few days prior to Hill's death, Brown, who was not working at the time and needed money, overheard Hill saying that he had "some guns and some money."

2

On August 30, 2012, when Brown thought that Hill would be out of town, Brown told Downer what Hill had said. The two men, who were "doped up" on methamphetamine, dressed themselves in dark-colored hoodies and gloves to "black[ ]" themselves out, and Brown drove them to Hill's home in Joyce's white Chevrolet Cavalier. Brown brought a knife and a baseball bat that he kept in a shed on his property. They arrived around 2:00 a.m. after parking down the street and walking through Hill's back yard.

Brown picked the lock to Hill's back door with his driver's license. Downer tripped as he entered the home, and Hill — who was *not* out of town — immediately came out of his bedroom. Hill moved toward Brown to grab him, and Brown shoved Hill back toward the bedroom. After Downer hit Hill twice with the bat, Hill lay moaning for a couple of minutes. Meanwhile, Brown rummaged through the home and took Hill's wallet, a weed eater, a couple of rings, and a jar of change and brought the items to the car. When he returned, he saw Hill lying face down on the floor, apparently deceased, with Downer standing over him. At Downer's direction, Brown pulled the

car to the side of the road in front of Hill's house, opened the vehicle's trunk, and entered the back door where Downer had already positioned Hill's body. The two men carried Hill's body to the trunk of the car.

They drove back to Brown's home because they "didn't know where else to take [Hill]" and backed the car up to a "burn pit" located about 40 yards behind the house, next to a shed that Brown used as a "shop." Around 4:00 a.m., they put Hill's body inside the pit, "[t]hrew some tires on him and some gas and set them on fire." They also burned the clothes they were wearing. The fire burned until approximately 8:00 a.m. when Brown and Downer put water, wood chip shavings, and dirt on the fire to extinguish it. Brown took Hill's rings to a store but was unsuccessful in selling them, so he gave one to Downer in exchange for marijuana and the other one, along with the weed eater, to an acquaintance in exchange for methamphetamine.[2] Brown then returned to his home, consumed

---

[2] The acquaintance testified at trial that he paid $20 in cash for the weed eater and denied receiving a ring from Brown or giving Brown any drugs. The

more drugs, and covered Hill's body with more wood shavings. Brown did not see Downer again until around midnight the next day, August 31, when they smoked more methamphetamine together. In the days following Hill's death, Brown lit several fires in the burn pit in an attempt to get rid of the body and the smell, using gasoline, kerosene, and "anything he could think [of]." Brown also took the carpet out of the car they used to transport Hill's body and vacuumed and cleaned the car using bleach. Brown admitted at trial that he gave several conflicting stories to officers.

Jamie testified that on August 29, the day before Hill's death, he towed Downer's camper to someone else's nearby property after an altercation with Downer over money. Jamie explained that, earlier that day, Downer, Brown, and Joyce were riding in a car that ran out of gas. Downer refused to use his own money to buy gas, so Jamie was forced to bring the group his last seven dollars to purchase gas so that they could get back home. The following day,

---

parties later stipulated that officers seized two rings from Downer when he was arrested.

just after Hill's death, Brown gave Jamie cash to pay him back for the gas he had purchased. Jamie also saw Brown give five dollars to Joyce. Jamie thought it was suspicious that Brown "had a wad of cash," which Brown told him he found in an abandoned house.

In the following week, Jamie's suspicions grew when he noticed the "[m]ost horrible smell you'll ever smell in your life" on the property. Jamie questioned Brown about the smell, and Brown told him it was a dead animal. However, when Jamie asked Brown to help him find and move the dead animal, Brown refused to show him where the animal was located. Jamie also found it suspicious that Downer and Brown built up the burn pit "all the sudden" beside the shed, putting concrete blocks around the pit, and mounted a light on the shed that pointed directly at the burn pit. He also observed both Downer and Brown burning "stuff" in the pit, which was smoldering each day he returned home from work that week. He specifically saw Brown "messing" with the burn pit and occasionally saw Downer on the property during this time. At some point, Joyce told him that Brown was "emotionally upset" and had told her "that he was going

6

to go to hell because him and [Downer] had buried a man outside the shed."[3] Jamie shared this information with his brother, and they decided to confront Brown while Downer was not there. Brown initially denied the allegation, but when Jamie and his brother started digging in the fire pit, Brown confessed that Hill's body was located in the pit. Jamie immediately called the police, and Brown was arrested the same day, September 5, 2012.

Sergeant Matthew Wurtz, who was assigned to respond to the missing persons report that had been filed for Hill,[4] was the first officer to arrive at Brown's home. Based on what Jamie told him, Sergeant Wurtz read Brown his rights under *Miranda*[5] before speaking with him and examining the burn pit, where he discovered

---

[3] Brown later testified that a few days before his arrest he "broke down to [his] wife and . . . told her about [him] and [Downer] breaking in to the house and [Hill] being killed." (Although Joyce and Brown were not formally married at the time of the crimes, Jamie testified that they were married at the time of Downer's trial.)

[4] After Hill's friends and pastor were unable to contact him for a few days, Hill's pastor filed a missing persons report on September 4. In response, an officer asked Hill's landlord to let him into Hill's home, but, after a brief search, the officer did not see anything out of place.

[5] See *Miranda v. Arizona*, 384 U.S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

7

"a pile of stuff that was surrounded by concrete block[s] kind of in a circular shape where stuff had been burning." The burn pit smelled distinctly of burnt flesh and was still smoldering. Officers discovered a charred and muddy skull with brain matter, loose bones with flesh and muscle tissue attached, and a metal VFW card with Hill's name on it. In the nearby shed, officers found a black and gold Louisville Slugger baseball bat with dark stains that were later confirmed to be Hill's blood. Officers impounded the white Chevrolet, which had dark stains in the trunk, and which smelled strongly of a household cleaner.

An examination of Hill's home revealed an area where blood had pooled at the bedroom door, bloodstains consistent with dragging someone through the home to the back door, a blood stain on Hill's bed that seeped through the sheets and into the mattress, and wipe marks of blood on the bedroom wall. An autopsy of Hill's remains, confirmed via DNA testing, indicated that the cause of death was blunt force trauma to the head that occurred around the time of his death, before his body was burned by fire. An additional

8

examination by an expert in forensic anthropology and traumatic analysis of human remains also showed that injuries to Hill's skull and jaw were consistent with blunt force trauma due to the depressed nature of the fractures.

Downer was located and arrested on September 6, 2012, and during his initial custodial interview, Downer stated that the Army ring he was wearing was given to him by Brown, which he tried to sell at a pawn shop. Downer denied killing Hill or participating in the crimes, but he admitted that he put mulch on the burn pit with Brown and moved the cinderblocks around the perimeter of the burn pit. During a second interview on September 11, 2012, Downer again denied any involvement with Hill's death.[6] However, he also made statements that he and Brown used drugs together; that he was at Brown's mother's house two or three weeks before the murder; that he helped Brown unload two car loads of mulch the past Tuesday or Sunday using Brown's white car; that Brown then burned the mulch; that Brown "probably" put the body in the burn pit on

_____

[6] Video recordings of both interviews were played at trial.

Tuesday night; that he saw smoke coming out of the burn pit on Monday; and that he burned his clothes in the burn pit.

A search of Downer's cell phone showed that someone texted Downer on the evening of September 5: "don't come here the law is everywhere GBI too," and cell phone records showed that Downer then called Brown several times that night, beginning at 9:56 p.m., and several times again on September 6. Joyce testified that one evening around the time that he moved off their property,[7] Downer called Brown. Brown then told her that he was going to meet Downer at the store. Sometime later that evening after midnight, she saw three men, including Downer, in her car backing up to the burn pit.

1. Downer argues that the evidence was insufficient to sustain his convictions as a matter of Georgia statutory law because Brown's testimony was not corroborated by "credible evidence." We disagree.

Although "[t]he testimony of a single witness is generally sufficient to establish a fact," in "felony cases where the only witness is an accomplice," corroborating evidence is required to support a

_____

[7] Joyce could not recall the exact date.

guilty verdict. OCGA § 24-14-8. See also *Edwards v. State*, 299 Ga. 20, 22 (1) (785 SE2d 869) (2016). "Whether accomplice testimony has been sufficiently corroborated is a question for the [fact-finder], and even slight corroborating evidence of a defendant's participation in a crime is sufficient." *Williams v. State*, 313 Ga. 325, 329 (1) (869 SE2d 389) (2022).

Downer argues that his convictions stem entirely from the self-serving and changing testimony of his co-indictee and that the State's attempt to corroborate Brown's testimony failed to provide independent corroboration of Downer's participation in the crimes. However, this argument ignores the evidence from multiple independent sources showing Downer's involvement in the crimes. Joyce testified that Downer called Brown one evening around the time that Downer moved off their property and that she then saw Downer in the car with Brown, backing up to the burn pit in the middle of the night. Jamie testified that shortly after he moved Downer's camper, Brown and Downer built up a burn pit and burned things in the pit all week, with a "horrible smell" that became worse

11

over time. When Downer received a text message that police officers were "here," he made multiple calls to Brown. And at the time Downer was arrested, he was wearing Hill's Army ring. In addition, Downer's own statements included admissions that he helped build the pit, put mulch on the pit, and burned his clothes in the pit following Hill's death.[8] We conclude that this evidence provided corroboration of Brown's testimony and supported Downer's participation in the crimes for which he was convicted. See *Montanez v. State*, 311 Ga. 843, 849 (1) (b) (860 SE2d 551) (2021) ("The necessary corroboration may consist entirely of circumstantial evidence, and evidence of the defendant's conduct before and after the crime was committed may give rise to an inference that he participated in the crime." (citation and punctuation omitted)); *McCammon v. State*, 306 Ga. 516, 519-20 (1) (b) (832 SE2d 396) (2019) ("The evidence need not be sufficient in and of itself to

---

[8] Although we conclude in Division 2 below that Downer's statements were properly admitted at trial, in determining the sufficiency of the evidence, we consider all of the evidence that was admitted at trial, even if it is argued that certain evidence should have been excluded. Cf. *Grier v. State*, 313 Ga. 236, 240 (2) (869 SE2d 423) (2022).

warrant a conviction, so long as it is independent of the accomplice's testimony and directly connects the defendant to the crime or leads to the inference of guilt." (cleaned up)).

Although Downer points to several apparent inconsistencies in the State's evidence, on appeal "[w]e leave to the [fact-finder] the resolution of conflicts or inconsistencies in the evidence, credibility of witnesses, and reasonable inferences to be derived from the facts." *Smith v. State*, 308 Ga. 81, 84 (1) (839 SE2d 630) (2020). Also, Downer points to the lack of evidence tying him directly to the murder weapon, but the evidence as described above was more than sufficient to corroborate that Downer participated in and aided Brown in the crimes and thus was at least a party to the crimes for which he was convicted. See *Daniels v. State*, 306 Ga. 559, 561-62 (1) (832 SE2d 372) (2019) (although appellant's accomplice was the person who shot the victim, the evidence was sufficient to show appellant participated in the crimes and shared criminal intent); OCGA § 16-2-20 (a) ("Every person concerned in the commission of a crime is a party thereto and may be . . . convicted of commission of

the crime."). Accordingly, this enumeration fails.

2. Downer asserts that the trial court erred in failing to suppress his custodial statements. We are not persuaded.

"In deciding the admissibility of a statement during a *Jackson-Denno*[9] hearing, the trial court must consider the totality of the circumstances and must determine the admissibility of the statement under the preponderance of the evidence standard." *Munn v. State*, 313 Ga. 716, 726-27 (7) (873 SE2d 166) (2022) (citation and punctuation omitted). To the extent that the "controlling facts are not in dispute, such as those facts discernible from a videotape, our review is de novo." *Ellis v. State*, 312 Ga. 243, 247 (1) (862 SE2d 279) (2021) (citation and punctuation omitted). "On the other hand, to the extent that legally significant facts were proved by evidence other than the video recording, the trial court as fact[-]finder was entitled to determine the credibility and weight of that other evidence." *State v. Abbott*, 303 Ga. 297, 299 (1) (812 SE2d 225) (2018).

---

9 See *Jackson v. Denno*, 378 U.S. 368 (84 SCt 1774, 12 LE2d 908) (1964).

14

After Downer was arrested on the afternoon of September 6, Special Agent Laura Goza of the GBI began interviewing Downer around 1:10 p.m. The interview, which was video- and audio-recorded, was played at the *Jackson-Denno* hearing. It is undisputed that the recording showed that when Agent Goza attempted to explain why she was interviewing him, Downer immediately began talking. Agent Goza repeatedly asked him to stop talking and listen to her explanation of the waiver of rights form. Agent Goza was eventually able to explain the form and advise Downer of his rights under *Miranda*, including the right to an attorney and the right to remain silent. Throughout this exchange, Downer continued to make statements regarding the allegations against him. At one point, he asked if he needed a lawyer to go over the form. Agent Goza read to him from the form that he had the right to an attorney and that he would be agreeing to speak with her without an attorney and that he was not required to sign the form. Downer replied, "I don't mind talking to you ma'am. I don't mind talking, I have no problems with that. I understand." After approximately an hour, Downer

suddenly asked, "Hey, can I get Henry Simmons in here?" When Agent Goza found out that Simmons was a lawyer, she asked Downer whether he wanted to have an attorney during questioning. Downer replied, "I don't need one. I haven't done nothing. I don't need one." The interview then concluded a little more than an hour later.

On September 10, 2012, while in custody following the first interview and after he had been appointed counsel, Downer was seen by the jail nurse. He asked the nurse to write down several statements protesting his innocence. He also told her that he wanted to speak with investigators and that she should write down his request. The nurse provided her handwritten notes of this conversation to the Sheriff's Department, which relayed the request to the GBI. On September 11, Agent Goza returned to interview Downer. This interview was also video- and audio-recorded and played at the *Jackson-Denno* hearing.[10] During that interview,

---

[10] The final portion of this interview was only audio-recorded and was played for the trial court. The trial court also heard testimony from Agent Goza and the jail nurse.

Downer initially denied telling the nurse that he wanted to speak with investigators, but then told Agent Goza that he was glad she was there because he had information that could prove where he was around the time of Hill's death. Downer acknowledged that his attorney told him not to talk with the agents, but he immediately began discussing his various alibis. Then, after reviewing his rights under *Miranda* and agreeing to speak with her again, Downer answered questions from Agent Goza and another GBI special agent.

Dr. Marlyne Israelian, who conducted several tests to assess Downer's intellectual and cognitive function, testified at the *Jackson-Denno* hearing that Downer had a brain injury due to a 2009 bike accident "that selectively impacts the areas of his brain that govern and rule language, reasoning, thought, sequencing, planning, [and] organization" and that he suffered from these deficits at the time he was interacting with officers in this case. Dr. Israelian opined that the *Miranda* waiver of rights form Downer signed "involve[d] piecing together multiple concepts and then

17

making this decision based on judgment and reasoning and perspective in an accurate assessment of one's ability or disability, and the potential risk or benefit of proceeding. So it's a quite complex problem." She concluded that, because of his cognitive deficits, he would have had a very difficult time asserting or reasserting his rights unequivocally. Following the hearing, the trial court issued an order suppressing only that portion of Downer's first statement given after Downer asked for a certain attorney by name.

(a) Downer argues that the trial court should have suppressed the entire first interview because (1) he unambiguously invoked his rights under *Miranda* at the beginning of the interview, before Agent Goza even read him those rights, and (2) his mental disabilities prevented him from voluntarily, knowingly, and intelligently waiving his rights under *Miranda*.

However, the record shows that the trial court did not err when it determined otherwise. The video recording shows that as Agent Goza started to explain why she was there, Downer immediately began talking, despite her attempts to stop him and explain the

18

*Miranda* form. The following exchange then occurred:

> GOZA: Okay. But I want to fill this out first. Go over this with you.
>
> DOWNER: In the end, I won't even convict him first, for accusing me of something. I mean I don't care if he did. I mean, I do care. But if he didn't do it and he's still putting me in there with him, because that's the way he is.
>
> GOZA: What do you mean if he didn't do it?
>
> DOWNER: Look I mean I'm avoiding him, and avoiding him, and I'm avoiding him. I avoided him every day 'cause the only thing that he's been using me for is, you know I had a little bit of money. And I spent it trying to help him and his wife and Jamie. Now if you don't believe me, go to Jamie. [Brown] is so full of crap you . . . [unintelligible].
>
> GOZA: I talked to Jamie.
>
> DOWNER: Right. That's all I've got to say [crosstalk].
>
> GOZA: Okay. So listen, can you read and write?
>
> DOWNER: Yes ma'am. Yes ma'am.

At that point, Agent Goza continued explaining Downer's rights under *Miranda*, and Downer replied that he did not "mind talking to [Agent Goza]." And when Agent Goza cautioned, "Okay. I don't want you to sign anything you don't want to sign," Downer replied, "Well no, because I don't care. I'm good."

It is well settled that "[p]olice must scrupulously honor a suspect's right to remain silent if the person clearly and unambiguously states that he wants to end a custodial

19

interrogation." *Causey v. State*, 307 Ga. 147, 148 (2) (834 SE2d 857) (2019) (citations and punctuation omitted). However, "if a defendant equivocates in asserting the right, a police officer is under no obligation to clarify or to stop questioning." Id. at 149 (2) (citations and punctuation omitted).

Here, although Downer points to his statement, "That's all I've got to say" as an unambiguous request to end the interview, the trial court specifically found that, based on its review of the video, Downer's body language, tone, and cadence of his speech, and the context in which the statement was made, would cause a reasonable officer to interpret that statement to mean, "That's all I've got to say, *about that*." (Emphasis in original.)[11] In particular, the trial court concluded that Downer was "attempting to explain his distrust of Brown" and that nothing in Downer's speech or manner at that time

---

[11] In context, it is clear that "about that" refers to Downer's belief that Brown was using Downer because of his money. We also note that elsewhere in its order granting in part and denying in part Downer's motion to suppress, the trial judge explained that he had listened to this portion of the interview multiple times and that, although the audio quality is poor, particularly where Agent Goza and Downer are speaking over each other, he understood Downer to say "That's all I've got to say *right there*."

indicated that he intended to convey a wish to terminate the interview. Because the video recording supports the trial court's findings, we cannot say that the trial court erred in making that determination. See *Causey*, 307 Ga. at 150 (2) (appellant did not clearly and unambiguously invoke right to remain silent where, in spite of making statements that he wanted to leave, appellant "never stopped engaging officers in conversation, even after being told repeatedly that he did not have to talk to authorities").

Downer also argues that he only capitulated in waiving his rights under *Miranda* and continued speaking with Agent Goza because he suffers from significant brain damage and that, therefore, his statements were not given voluntarily, knowingly, and intelligently. However, as the trial court noted in its order, "a defendant's alleged cognitive impairment is not dispositive on the question of voluntariness but is one factor for the trial court to consider in the context of the totality of the circumstances surrounding a statement and a waiver of *Miranda* rights." *Barrett v. State*, 289 Ga. 197, 199 (1) (709 SE2d 816) (2011). "And, whether

21

a defendant lacks the capacity to understand and waive such rights due to a mental deficiency . . . is a question of fact for the trial court to determine." Id. In addition to Dr. Israelian's testimony, the trial court also considered that Downer had expressed a clear understanding of his rights under *Miranda* and concluded that Downer had sufficient mental capacity under Georgia law to waive his rights under *Miranda* and did, in light of the totality of the circumstances, voluntarily, knowingly, and intelligently waive those rights. And the record shows that Downer appeared to understand the questions posed to him and responded accordingly, even though, as found by the trial court, Downer "was hard to understand at times."

Viewed in this context, we cannot say that the trial court's determination was clearly erroneous. See *Abbott*, 303 Ga. at 299 (1); *Height v. State*, 281 Ga. 727, 729 (2) (642 SE2d 812) (2007) (affirming denial of motion to suppress under a clearly erroneous standard where trial court considered conflicting evidence of defendant's mental capacity and concluded that defendant

22

understood his rights and the consequences of waiving them).

(b) With respect to the second interview, Downer argues that the trial court's conclusion that Downer reinitiated contact with the GBI agents prior to his second statement was incorrect as a matter of both fact and law. Specifically, Downer argues that when he was brought back to speak with Agent Goza, he clearly denied initiating contact. Relying on *Maryland v. Shatzer*, 559 U.S. 98 (130 SCt 1213, 175 LE2d 1045) (2010), Downer argues that the investigators should have immediately cut off questioning at that point since Downer had invoked his right to counsel on September 6, was appointed a lawyer at his first appearance,[12] and told the investigators directly that he did not ask to speak to them.

However, the trial court was authorized to credit the written statement and testimony of the nurse over that of Downer and to determine that, despite his initial denial, Downer had requested to speak with officers and immediately thereafter expressed a desire to

---

[12] Sometime between September 6 and September 10, Downer secured counsel through the Mountain Judicial Circuit's Office of the Public Defender.

speak with them. See *Love v. State*, 309 Ga. 833, 838 (2) (848 SE2d 882) (2020) (affirming denial of motion to suppress where trial court credited the testimony of officers over defendant's). In addition, the trial court determined that the officers again reviewed Downer's rights under *Miranda* and that Downer expressed his understanding of those rights before waiving them and agreeing to speak with the officers without his attorney present. See *Whitehead v. State*, 308 Ga. 825, 829 (2) (842 SE2d 816) (2020) (trial court did not err in admitting defendant's custodial statement where, after initially invoking right to remain silent, defendant immediately changed his mind and expressed a desire to talk about a shooting). And because the trial court did not err by concluding that Downer initiated further conversation with officers after invoking his right to counsel, *Shatzer* does not apply. See *Bell v. State*, 305 Ga. 707, 710-11 (3) n.6 (827 SE2d 665) (2019) (explaining *Shatzer* involved *police-initiated* interrogations that occurred after the defendant had invoked his right to counsel and after a break in custody).

Downer also argues, in the alternative, that the trial court

24

erred in not suppressing that portion of the second interview following Downer's repeated references to his lawyer. However, the trial court concluded, and the video recording supports, that Downer actually stated several times that, although his attorney would not want him to speak to the investigators alone, he wanted to speak with them against that advice, which Downer demonstrated by continuing to speak. Thus, we conclude that the trial court did not err in determining that these statements were not a clear and unambiguous request for counsel. See *Dozier v. State*, 306 Ga. 29, 35 (4) (b) (829 SE2d 131) (2019) ("[T]he mere mention of the word 'attorney' or 'lawyer' without more, does not automatically invoke the right to counsel." (citation and punctuation omitted)).

3. Downer asserts that the trial court erred in permitting two of the State's witnesses to testify as to hearsay statements.

When reviewing such evidentiary claims, "we accept a trial court's factual findings unless clearly erroneous and review a trial court's ultimate decision on the issue for an abuse of discretion." *Morrell v. State*, 313 Ga. 247, 251 (1) (869 SE2d 447) (2022).

25

(a)     Downer first points to the following portion of Jamie's testimony on direct examination as double hearsay:

> Q: And you talk about your suspicions raised and we've talked about the activity and the blocks and the odor. Did anything else happen that raised your suspicions even more and led you to make this phone call?
> A: Yes. *My mother had come to me and, uh, she had said — . . . that [Brown] had said to her, after he got emotionally upset, that he was going to go to hell because him and [Downer] had buried a man outside the shed.*
> Q: Now, as a result of being told that did you have some conversation with other family members?
> A: Yes, I went and talked to my brother about it. . . . We decided that the best thing for us to do was to go confront [Brown] about it because [Downer] was not around at that time. So we confronted [Brown] about it, and at first he denied [it]. So me and my brother was going to ease our conscious [sic] and dig the fire pit up ourself.

(Emphasis supplied.) When defense counsel objected to the portion emphasized above, the trial court initially ruled that the prosecutor's stated purpose of "explain[ing] his conduct" was insufficient. After the prosecutor argued, "I'm going into why he made the call to police and why his suspicions rose to the point that he made the call to the police," the trial court overruled the objection.

Pretermitting whether each layer of alleged hearsay meets a

26

statutory exception to the hearsay rule,[13] the trial court accepted the State's proffer that the statement was being offered to explain why Jamie called the police and not to prove the truth of the matter asserted. Thus, the trial court concluded that the statement was not hearsay. See OCGA § 24-8-801 (c) (defining hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted"). And there is nothing in the record to indicate that the trial court considered this testimony for a purpose that would have implicated the hearsay rule. See *Thomas v. State*, 284 Ga. 540, 545 (2) (668 SE2d 711) (2008) ("At a bench trial such as this, the trial court is presumed to have separated admissible evidence from inadmissible evidence and considered only the former in reaching its judgment." (citation and punctuation omitted)). Accordingly, we discern no abuse of discretion in the trial court's admission of this testimony. See *Gomillion v. State*, 298 Ga. 505, 506 (1) (783 SE2d

---

[13] See OCGA § 24-8-805 ("Hearsay included within hearsay shall not be excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule.").

103) (2016) (no abuse of discretion in admitting witness's testimony explaining that he left after the shooting because someone told him that the defendant had been looking for him where the trial court instructed the jury that the statement was admitted not because it may be true but to explain the witness's conduct).

(b) Downer also argues that Joyce improperly testified to statements that Brown made. During the State's direct examination of Joyce, the following exchange took place:

Q: . . . But let's talk about this day that you've already said you remember telling about [Downer] coming back to the house.
A: Yes, he came and talked with us, sorry.
Q: Okay. That's all right. And did [Downer] leave the house by himself or did [Downer] and [Brown] leave the house together that night?
A: At first I was thinking he was going to go home back to the camper because I didn't realize that [Jamie] had moved the camper. Uh, [Downer] called my husband at some point after that.
Q: Okay. And tell the Judge, if you would, how you know [Downer] called your husband?
A: My husband picked up the phone and he told me who that was. My husband told me.
                    . . .
Q: All right. After the phone call do you know how long it was?
A: Yes.

28

Q: How long [Brown] was still at the house?
A: I don't know, probably 15 minutes until he left and he told me that he was going to the store, that he was going to go see [Downer] at the store.
Q: When did you see [Brown] again?
A: Late.

When defense counsel objected, the State responded that "[s]tatements made by the co-conspirator as to the subject of the conspiracy are admissible. It doesn't have to be in furtherance of the conspiracy." The trial court determined that Brown's statements — that Downer was on the phone and that he was leaving to meet Downer — were admissible under three exceptions to the hearsay rule: a statement by a co-conspirator (OCGA § 24-8-801 (d) (2) (E)), an out-of-court statement by a testifying witness (OCGA § 24-8-801 (d) (1) (A)), and a present sense impression (OCGA § 24-8-803 (1)).

The trial court did not abuse its discretion in concluding that Brown's initial statement that he was on the phone with Downer as he was speaking with him falls within the present sense impression exception to the hearsay rule. "To be admitted under this exception, the statement must describe or explain an event or condition that is

29

personally witnessed by the declarant and is essentially contemporaneous to the statement." *Varner v. State*, 306 Ga. 726, 731 (2) (a) (ii) (832 SE2d 792) (2019) (citation and punctuation omitted). See also OCGA § 24-8-803 (1) (including as an exception to the hearsay rule "[a] statement describing or explaining an event or condition made while the declarant was perceiving the event or condition or immediately thereafter"). Brown's statement identifying the person he was presently speaking to on the phone satisfies these criteria.

With respect to the statement that Brown was leaving to meet Downer at the store, Downer argues that the State failed to establish a conspiracy and, thus, that this statement could not have been made in the course of a conspiracy. OCGA § 24-8-801 (d) (2) (E) provides in pertinent part:

> Admissions shall not be excluded by the hearsay rule. An admission is a statement offered against a party which is . . . [a] statement by a coconspirator of a party during the course and in furtherance of the conspiracy, including a statement made during the concealment phase of a conspiracy. A conspiracy need not be charged in order to make a statement admissible.

Here, the trial court correctly noted these requirements and specifically found that there was sufficient evidence to show that Downer and Brown conspired to kill Hill. And in ruling that the statement was admissible, the trial court also implicitly found that the statement was in furtherance of that conspiracy. See *Kemp v. State*, 303 Ga. 385, 393 (2) (b) (810 SE2d 515) (2018) (explaining that, although "the trial court did not make any express factual findings, . . . we can infer from its denial of the motions that it implicitly found that [the] statements were made in the course of and in furtherance of a conspiracy").

When reviewing a trial court's ruling regarding the admissibility of such evidence, "we accept the trial court's factual findings, such as whether a statement was made in furtherance of a conspiracy, unless they are clearly erroneous." *Golden v. State*, 310 Ga. 538, 545 (3) (852 SE2d 524) (2020) (citation and punctuation omitted). In addition, "[w]e apply a liberal standard in determining whether a statement is made in furtherance of a conspiracy, and

31

statements that further the interests of the conspiracy in some way meet this standard." *Kemp*, 303 Ga. at 393 (2) (b).

Based on our review of the record, we cannot say that the trial court's findings were clearly erroneous. At the time Joyce testified, the State had already established the sequence of events and provided direct testimony from Brown that Downer was involved in a conspiracy to rob and murder Hill, and as explained in Division 1, Brown's testimony was sufficiently corroborated as a matter of Georgia law. And in applying the appropriate standard in determining whether this statement was made in furtherance of the conspiracy, we conclude that Brown's statement — concerning the reason he was leaving the house on the trip that ultimately culminated in Hill's murder — could be construed to show that Brown and Downer spoke on the phone in order to make a plan to meet and carry out the crimes at issue and that Brown told Joyce he was meeting Downer at the store in order to conceal his true intent for leaving the house that night. Accordingly, the trial court did not clearly err in admitting this portion of Joyce's testimony. See *Mosley*

*v. State*, 307 Ga. 711, 717 (3) (a) (838 SE2d 289) (2020) ("given the liberal standard applied to this inquiry, it was not clearly erroneous for the trial court to conclude that [the co-conspirator's] statement that [the defendant] shot [the victim] was made in furtherance of the conspiracy").

4. Downer argues that the State withheld evidence that could have been used to impeach "its two most critical witnesses" in violation of his due process rights under *Brady v. Maryland*, 373 U.S. 83 (83 SCt 1194, 10 LE2d 215) (1963). Specifically, Downer asserts that the State arranged for a wedding for Brown and Joyce in December 2013, in a building adjacent to the Habersham County jail, in exchange for Brown's guilty plea and agreement to testify against Downer at trial. Downer learned of the wedding post-trial and included this claim in his motion for new trial. At the second motion for new trial hearing, an e-mail from Brown's attorney to the district attorney's office was admitted that stated:

> [Brown], it seems, is hoping for a couple of things to happen before he enters a plea. One, he would like to re-marry his ex-wife. To this end I spoke with Sheriff Terrell

today and he said while this isn't something he'd normally allow, that if it would help resolve the case he could allow a low-key wedding at the jail.

The State responded, stating that "he can at any time take the death penalty off the table by accepting responsibility and pleading" and "we don't have any problem with reasonable accommodations that the Sheriff can live with that would make it possible for Brown to do the right thing." One of Brown's attorneys testified at the hearing that he was present at the wedding, which Brown's relatives also attended. The Sheriff testified that he spoke with the State about arranging the wedding, explaining that "after a short conversation about [how] he was trying to work out something so he would move his case on through and get him out of our jail[,] . . . I finally g[a]ve in and said we would allow it to happen, a short ceremony with just a couple of folks to be present." The trial court agreed that the State failed to disclose material impeaching evidence but determined that disclosure would not have changed the result of the trial.

To prevail on a *Brady* violation claim, a defendant must show:

(1) the State possessed evidence favorable to his defense;

(2) he did not possess the favorable evidence and could not obtain it himself with any reasonable diligence; (3) the State suppressed the favorable evidence; and (4) had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the trial would have been different.

*Harris v. State*, 313 Ga. 653, 664 (5) (872 SE2d 732) (2022) (citation and punctuation omitted). "To establish the fourth prong, often referred to as materiality, a defendant does not need to show that he necessarily would have been acquitted, but only that the State's evidentiary suppression undermines confidence in the outcome of the trial." *Anglin v. State*, 312 Ga. 503, 510 (2) (b) (863 SE2d 148) (2021) (citation and punctuation omitted). On appeal, we review a trial court's factual findings regarding a *Brady* claim for clear error but review de novo the court's application of the law to the facts. See *Harris*, 313 Ga. at 664 (5).

Here, Downer argues that, in determining that no reasonable probability exists that the outcome of the trial would have been different, the trial court improperly limited its reasoning to the impeachment value of the evidence as to Brown and failed to

consider its value as to impeaching Joyce as well and that Downer was entitled to cross-examine Joyce on the fact that she had recently married Brown and whether and to what extent she would be willing to lie for Brown. We agree with the trial court that Downer has satisfied the first three prongs of a *Brady* violation.[14] See *Giglio v. United States*, 405 U.S. 150, 154-55 (92 SCt 763, 31 LE2d 104) (1972) (the suppression of impeachment evidence that may be used to challenge the credibility of a witness may constitute a *Brady* violation). However, in order to address the fourth prong, "we must evaluate [the withheld] evidence in the context of the entire record." *Chavez v. State*, 307 Ga. 804, 813 (3) (837 SE2d 766) (2020) (citation and punctuation omitted).

The record shows that when Brown and Joyce testified at trial, they consistently referred to each other as husband and wife. Joyce also testified that at the time Downer was living on her property, she and Brown were not "ceremonially married" but were "living

---

[14] The trial court specifically noted that, based on the evidence and testimony presented, Downer could not have known that a marriage ceremony was a part of the plea negotiations.

36

together, which is kind of the same." And Jamie testified that Brown was "now married to [his] mother." During his initial interview with Agent Goza, Downer himself referred to Joyce as Brown's wife. Thus, Downer's counsel had the opportunity to cross-examine Joyce about the nature of her relationship with Brown but chose not to.[15] See *Morris v. State*, 284 Ga. 1, 3 (2) (662 SE2d 110) (2008) (no *Brady* violation where undisclosed evidence was consistent with other evidence the State had already presented to the jury and was therefore not outcome determinative). Moreover, the most damaging portion of Joyce's testimony for Downer was the statement that she saw three men, including Downer, back a car up to the burn pit, though she could not recall the date. But Downer's participation in the crimes was corroborated by witnesses other than Joyce, as well as his own statements and conduct after the crimes.

On the other hand, the State's primary witness against Downer — Brown — was thoroughly cross-examined and impeached, such that the trial court "did not give substantial weight to Brown's

---

[15] Downer's counsel elected not to cross-examine Joyce at all.

testimony, as [the trial court] did not find him to be a very credible witness." And, as noted by the trial court, "Brown received a far more valuable benefit in exchange for his testimony, which was disclosed and used by the Defendant during the course of the trial to illustrate Brown's motivation for testifying." Recognizing that Brown had been thoroughly impeached, the trial court specifically stated in its order that the disclosure of the wedding ceremony and the use of it to further impeach Brown would not have changed the court's determination of Downer's guilt. Thus, Downer cannot meet his burden of showing the fourth prong — that the outcome of the trial would have been different had the State properly disclosed evidence of the wedding ceremony. See *Hood v. State*, 311 Ga. 855, 864 (1) (860 SE2d 432) (2021) (although full scope of witness's "possible incentives to cooperate with the State was not made known to the jury, the jury was nonetheless aware there was reason to regard his testimony with skepticism" and defendant was therefore unable to establish the fourth *Brady* prong); *United States v. Tellechea*, 478 F. App'x. 605, 608 (IV) (11th Cir. 2012) ("The mere

possibility that an item of undisclosed information might have helped the defense or might have affected the outcome of the trial does not establish 'materiality' in the constitutional sense." (citation and punctuation omitted)); *United States v. Bowe*, 426 F. App'x. 793, 799 (III) (B) (1) (11th Cir. 2011) (no *Brady* violation where the alleged content of the undisclosed evidence would have offered some probative value for impeachment purposes, but did not rise to the level of materiality under *Brady*); *United States v. Noriega*, 117 F3d 1206, 1220 (IV) (A) (11th Cir. 1997) ("Because there is *independent corroborating evidence* of the guilt of the defendants, there is no reasonable probability that the result of the trial would have been different had the undisclosed impeachment material been disclosed prior to trial." (citation and punctuation omitted; emphasis in original)). Accordingly, this enumeration of error fails.

5. Downer maintains that the trial court erred in denying his post-trial motion for DNA testing. We disagree.

OCGA § 5-5-41 (c) (3) provides that a defendant is entitled to post-conviction DNA testing if he meets, in addition to other

procedural conditions not at issue here, each of the following requirements:

> (A) Evidence that potentially contains [DNA] was obtained in relation to the crime and subsequent indictment, which resulted in his or her conviction;
> (B) The evidence was not subjected to the requested DNA testing because the existence of the evidence was unknown to the petitioner or to the petitioner's trial attorney prior to trial or because the technology for the testing was not available at the time of trial;
> (C) The identity of the perpetrator was, or should have been, a significant issue in the case; [and]
> (D) The requested DNA testing would raise a reasonable probability that the petitioner would have been acquitted if the results of DNA testing had been available at the time of conviction, in light of all the evidence in the case.

See also *De La Cruz v. State*, 303 Ga. 24, 32-33 (7) (810 SE2d 84) (2018) (defendant may be entitled to post-conviction DNA testing if he meets all of the statutory requirements listed in OCGA § 5-5-41 (c) (3), (4), and (7)).

The record shows that four days before trial began, the State disclosed a GBI lab report with the results of DNA testing on the baseball bat recovered from the shed on Brown's property. The report, dated March 21, 2013, indicated that the sample taken from

the bat contained the DNA profile of two individuals, the victim and an unknown person. Downer filed a post-trial motion for DNA testing pursuant to OCGA § 5-5-41. At a hearing on the motion, Jami Harman testified as an expert in DNA testing. She explained that the GBI took four swabs from the wide end of the bat, that the remaining swabs could still be tested, and that the GBI never conducted any DNA testing on the handle end of the bat because the test kits available at that time could not cut through the chemicals used during their latent fingerprint testing. However, newer test kits would enable an analyst to test the handle end of the bat for DNA despite the presence of chemicals from the previously-conducted fingerprint testing. Harman testified that newer testing may also yield a more "discriminating result" regarding the identity of the second DNA contributor on the wide end of the bat. Harman acknowledged that testing would not be able to determine when or how any particular DNA was deposited on the bat. The trial court denied the motion, finding that Downer had failed to show a reasonable probability that the DNA evidence would call into

question the court's confidence in the verdict.

Because Downer could have been convicted of armed robbery and felony murder predicated on burglary as a party to those crimes, whether Downer actually used the bat to strike the fatal blows was not required to prove those crimes. At most, the lack of Downer's DNA on the bat could have been used to impeach Brown's testimony that Downer had beaten Hill with the bat. And the trial court was already aware that there was no physical evidence linking Downer to the bat, but nonetheless concluded that the weight of evidence was sufficient to find Downer guilty as a party to the crimes for which he was convicted. Thus, even if post-trial DNA testing would have proven that Downer's DNA was not on the bat, there is not a reasonable probability that the results would have led to Downer's acquittal. Accordingly, the trial court did not abuse its discretion in denying Downer's motion. See *De La Cruz*, 303 Ga. at 33 (7) (trial court properly denied motion for post-trial DNA testing where the trier of fact had already been informed at trial that there was no physical evidence linking the defendant to the crime scene and

defendant was therefore unable to show a reasonable probability that he would have been acquitted had the DNA results been available at the time of trial); *Crawford v. State*, 278 Ga. 95, 99 (2) (b) (597 SE2d 403) (2004) (affirming trial court's denial of post-trial DNA testing where hypothetical DNA testing results, even if assumed valid, would not in reasonable probability have resulted in the defendant's acquittal).

*Judgment affirmed. All the Justices concur.*

Decided September 20, 2022.

Murder. Habersham Superior Court. Before Judge Smith.

*Jerilyn L. Bell, Thea A. Delage*, for appellant.

*George R. Christian, District Attorney, J. Edward Staples, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Eric C. Peters, Assistant Attorney General*, for appellee.